1  Allan D. NewDelman, Esq. (004066)
   ALLAN D. NEWDELMAN, P.C.
2  80 East Columbus Avenue
3  Phoenix, Arizona 85012
   Telephone: (602) 264-4550
4  Facsimile: (602) 277-0144
5  Email: anewdelman@adnlaw.net

6  Attorneys for Debtor

7

8              IN THE UNITED STATES BANKRUPTCY COURT

9              IN AND FOR THE DISTRICT OF ARIZONA

10 | In Re                              )
11 |                                    ) In Proceedings Under
   | PREMIERE HARDWOODS, LLC d/b/a      ) Chapter 11
12 | SUPERIOR HARDWOODS,                )
13 |                                    ) Case No. 2:15-bk-01182 BMW
   |                                    )
14 |            Debtor.                 ) APPLICATION TO SELL PERSONAL
   |                                    ) PROPERTY AND INTANGIBLES
15 |                                    ) FREE AND CLEAR OF LIENS AND
16 |                                    ) TO ASSUME AND ASSIGN
   |                                    ) EXECUTORY  CONTRACT
17 |                                    ) ("LEASE")
18 |                                    )
   |                                    ) AND
19 |                                    )
   |                                    ) APPLICATION TO APPROVE
20 |                                    ) COMPROMISE SETTLEMENT
   |                                    ) BETWEEN DEBTOR AND ARIZONA
21 |                                    ) BUSINESS BANK

22

23         Debtor, Premiere Hardwoods, LLC d/b/a Superior Hardwoods (hereinafter

24 "Premiere"), by and through undersigned counsel, Allan D. NewDelman, P.C., hereby

25
   moves the Court pursuant to 11 U.S.C. §363(b)(1), and 11 U.S.C. §365(d)(2) and (f) for
26
27 an Order Authorizing Sale of Personal Property and Intangibles Free and Clear of All

28 Liens; for an Order assuming and assigning that certain non-residential lease upon the

   real property in which Debtor's business operates; and the entry of an Order approving

   the compromise settlement stated herein between the Debtor and secured creditor,

1 Arizona Business Bank (the "Bank"). In the event that any higher or better offers are

2 received, as it relates to the sale of the personal property and intangibles, prior to or at

3
4 the hearing on this Application, Debtor requests that alternative offers, if any, be

5 considered at the hearing. The particulars of said sale and of the factual circumstances

6 outlined in the instant application are more particularly set forth in the accompanying

7 Memorandum.

8 DATED this 8th day of May, 2015
9

10 ALLAN D. NEWDELMAN, P.C.

11
/s/ Allan D. NewDelman
12 Allan D. NewDelman
Attorney for Debtor
13

14 **MEMORANDUM - APPLICATION TO SELL**

15 1.    Debtor filed the above captioned Chapter 11 proceeding on February 9,

16 2015, and is the Debtor-in-Possession.

17
18 2.    Debtor is the owner of personal property located at 5609 W. Latham

19 Street, #105, Phoenix, Arizona 85043 (the "Property") and is the Tenant under that

20 certain non-residential real property "Lease Agreement" described as:

21     Lease Agreement, dated April 5, 2002, by which Landlord, East Group
22 Properties, L.P., leased to Tenant approximately 56,144 rentable square feet at 616
South 55th Avenue, Suite 101,Phoenix, Arizona 85043, which under the Seventh
23 Amendment dated May 12, 2014, was changed to the 32,448 rentable square feet at
24 5609 West Latham Street, Suite 105, Phoenix, Arizona 85043, a copy of the Lease
Agreement and amendments 3, 5, 6, 7, 8 and 9 thereto is attached hereto as **Exhibit "1"**.
25
26 3.    The Property is subject to a security interests as follows:

27     a) First position UCC1, in favor of Arizona Business Bank, ("Bank"), as
evidenced by the recorded UCC1 attached hereto as **Exhibit "2"**.
28 (Recorded at the Arizona Secretary of State under 201116431021).
Pursuant to **Exhibit "2"**, Arizona Business Bank asserts a "blanket" lien

2

1    against all assets of the Debtor, including but not limited to, those certain
2    vehicles described in Schedule B attached as **Exhibit "3"**.

3    The outstanding obligation to the Bank is approximately $817,794.75.

4    4.    Debtor wishes to enter into an Asset Purchase Agreement with Supreme
5    Hardwoods of Arizona, LLC ("Buyer") whereby the Property will be sold to Buyer for
6
7    the sum of $270,000.00 to be paid on or before May 30, 2015. In addition thereto,
8    Debtor will assume the Lease described in Paragraph 2 above and assign the Lease to
9    Superior Hardwoods Investment Group, L.P., as set forth in the Assignment of Lease,
10   attached hereto as **Exhibit "4"**. This Asset Purchase Agreement is subject to and
11
12   conditioned on the approval of East Group Properties, L.P. ("Landlord").

13   5.    The Buyer under the Asset Purchase Agreement is Supreme Hardwoods
14   of Arizona, LLC. The assignee under the Lease Agreement is Superior Hardwoods
15   Investment Group, LLC.

16   6.    The members of Supreme Hardwoods of Arizona, LLC ("Buyer") are
17
18   Donald Hansen (80%) and four (4) other members who each own a five (5%) percent
19   membership interest. Donald Hansen owns an eighteen (18%) percent ownership
20   interest in the Debtor. The members of Superior Hardwoods Investment Group, LLC, is
21   Supreme Hardwoods of Arizona, LLC (Donald Hansen, Manager). Debtor believes that
22
23   the Buyer and assignee are insiders under the Bankruptcy Code.

24   7.    A true and correct copy of the Asset Purchase Agreement is attached
25   hereto as **Exhibit "5"**.

26   8.    Debtor proposes to sell the Property to Buyer free and clear of all liens
27   and encumbrances with liens to attach to the proceeds of sale. The purchase price is
28   insufficient to provide full payment to the underlying lien holder, Arizona Business

3

Bank. Despite this, the Bank will consent to the sale and will release its lien pursuant to this Application, including any and all claims it may have against the vehicles listed in **Exhibit "3"**. The Debtor asserts that the Bank's lien against the vehicles listed in **Exhibit "3"** are not perfected and therefore subject to the Debtor's avoidance powers under 11 U.S.C. §544. Accordingly, and in settlement of any such avoidance claims, the Bank has agreed to accept, out of the sale proceeds, the sum of $267,000.00. The remaining sum of $3,000.00 is to be paid to the Bankruptcy estate. The settlement between the Debtor and the Bank is conditioned upon the Bank's receipt of $267,000.00 on or before May 30, 2015. A further condition of the Bank in accepting the sum of $267,000.00 is the following Release:

> Except for the agreements of the Bank set forth herein, and as an additional material inducement to the Bank to enter into this transaction, upon the timely payment of the sum of $267,000.00, the Debtor, Premiere Hardwoods, LLC, on behalf of itself and its respective heirs, legal and personal representatives, successors and assigns (collectively and individually, the "Buyers Group"), hereby fully, finally and completely RELEASE and FOREVER DISCHARGE the Bank and its predecessors, successors, assigns, affiliates, subsidiaries, parents, partners, members, investors, officers, shareholders, directors, employees, attorneys and agents, past, present and future and their respective heirs, successors and assigns (collectively and individually, "Bank's Parties") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, debts, liens, actions and causes of action of any and every nature whatsoever and WAIVE and RELEASE any defense, right of counterclaim, right of set-off or deduction to the payment of the indebtedness evidenced by the Loan Documents, (except as expressed in the Asset Purchase Agreement) known or unknown, whether at law, by statute or in equity, in contract or in tort, under state and/or federal jurisdiction, and whether or not the economic effect of such alleged matters arise or are discovered in the future, which the Buyers Group now have or may claim to have against the Bank's Parties arising out of, connected with or relating to any and all acts, omissions or events occurring prior to the approval of the Asset Purchase Agreement by the Court, including, without limitation, the Loan Documents, Properties or any other loan at any time heretofore made by the Bank's Parties to Buyer's Group.

4

Upon payment to the Bank of the sum of $267,000.00, the Bank shall (within fifteen (15) days of the Court approval of the Asset Purchase Agreement) file with the Arizona Secretary of State an appropriate lien release or satisfaction.

9.     The price at which the Property is to be sold is not greater than the aggregate value of all known liens and encumbrances on the Property. However, such sale will be with the consent of the lienholder (Bank) whose lien will not be fully satisfied. Accordingly, the requirements of 11 U.S.C. §363(f) for a sale free and clear have been met.

10.     Debtor has used his best efforts to market the Business and the assets located therein by the following described action:

> a.     Before and after the bankruptcy, Debtor had talks with four (4) companies in the industry. Debtor is bound by non-disclosure agreements with most of these companies.
>
> b.     Debtor had discussions with a local auctioneer about various liquidation scenarios.
>
> c.     Debtor has had discussions with Supreme Hardwoods of Arizona, LLC to maximize the value offered for the assets.
>
> d.     Debtor had discussions with Arizona Business Bank as to value of the assets.

11.     Debtor hereby also requests that the 14-day stay of Fed. R. Bankr. Proc. 6004(h) be waived in order that the sale may close. Close of escrow is to occur on or before May 30, 2015 and therefore time is of the essence.

/ / /

5

# MEMORANDUM - APPLICATION TO APPROVE

## COMPROMISE SETTLEMENT

12.     The Debtor hereby incorporates, by reference, Paragraphs 1 through 11 above.

13.     Pursuant to **Exhibit "2"**, the Bank asserts a security interest in all of the assets of the Debtor.  The UCC1 Financing Statement was recorded on February 28, 2011, at the Arizona Secretary of State's Office.

14.     Pursuant to **Exhibit "3"**, the Debtor is the titled owner of a 2011 Hyundai Sonata, a 2004 Ford F150, a trailer and a Curtain Van.  The estimated value of these items is $33,500.00.

15.     Despite the recording of the UCC1 Financing Statement, it appears that the Bank did not take steps to record liens on the title of any of the items listed in Paragraph 14 above.

16.     The Debtor asserts that the Bank's failure to properly perfect liens on the assets listed in Paragraph 14 above, preserves the value of such assets for the benefit of the bankruptcy estate. The Bank asserts that its lien is not subject to avoidance.

17.     The Debtor and the Bank understand the costs on both sides to litigating the bankruptcy estate's entitlement to the lien avoidance.  As a result, the Bank has agreed to compensate the bankruptcy estate in the amount of $3,000.00.  This amount will be paid at the close of escrow out of the sale proceeds referenced above.

18.     The Debtor, in the exercise of its best business judgment and in consideration of the requirements of *In re A & C Properties*, 784 F.2d 1377 (9th Cir. 1986), *In re Woodson*, 839 F.2d 610 (9th Cir. 1988), and *In re Schmitt*, 215 B.R. 417 (9th Cir. BAP 1997), believes that the proposed compromise and settlement of the

6

Bank's disputed lien rights, is an appropriate resolution of this matter. Bankruptcy courts have broad discretion in approving compromise agreements. *In re Woodson*, 839 F.2d at 620. The Court may approve a compromise if it is fair and equitable. *Id.* In determining the fairness and adequacy of a proposed compromise agreement, the Court should consider the following four factors:

    (a)    The probability of success in the litigation;

    (b)    The difficulties, if any, to be encountered in the matter of collection;

    (c)    The complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it;

    (d)    The paramount interest of the creditors and a proper deference to their reasonable views.

Consideration of these factors does not require the Court to decide question of law or fact raised in the controversies sought to be settled, or determine that the compromise presented is the best possible outcome. Rather, the Court need only canvass the issues to determine whether the settlement falls "below the lowest point in the zone of reasonableness." *Newman v. Stein*, 464 F.2d 689, 698 (2d Cir. 1972). Accordingly, if the court finds the compromise does not fall below the threshold of reasonableness, the compromise should be approved. *In re Planned Protective Servs., Inc.*, 130 B.R. 94, 99 n.7 (Bankr. C.D. Cal. 1991).

19. The Debtor believes the proposed settlement is in the best interest of the creditors and parties-in-interest of this estate because it eliminates the potential costs, time, and effort that would be required to litigate the estate's avoidance rights as it relates to the vehicles. The Debtor, in its best business judgment, believes that the

7

1 compromise settlement contained herein is a fair and reasonable resolution and is in the

2 best interest of the estate.

3
4 WHEREFORE, Debtor respectfully requests an Order of this Court allowing the

5 following:

6 A. Approval of the compromise settlement between the Debtor and Arizona

7 Business Bank as stated herein;

8
9 B. Approval of the sale of the personal property located at 5609 W. Latham

10 Street, #105, Phoenix, Arizona 85043, to Supreme Hardwood of Arizona, LLC, and for

11 for the assumption and assignment of that certain executory contract between Debtor

12 and East Group Properties, L.P., to Superior Hardwoods Investment Group, L.P., as

13 described in the Asset Purchase Agreement or to the highest or best offer and free and

14
15 clear of any liens, with liens to attach to proceeds of sale for the benefit of Arizona

16 Business Bank. Any higher or better offers would be subject to the approval of East

17 Group Properties, L.P., (the Landlord) and Arizona Business Bank.

18 DATED this _8_ day of May, 2015

19
20 ALLAN D. NEWDELMAN, P.C.

21
Allan D. NewDelman
22 Attorney for Debtor

COPY of the foregoing mailed
23 this _7_ day of May, 2015, to:

24 U. S. Trustee's Office
25 230 N. First Avenue - Suite 204
Phoenix, Arizona 85003
26
27 ///

28

8

Bradley D. Pack
Engelman Berger, P.C.
3636 N. Central Avenue
Suite 700
Phoenix, Arizona 85012
Attorney for Arizona Business Bank

Adam Nach, Esq.
Lane & Nach, P.C.
2001 E. Campbell
Suite 103
Phoenix, Arizona 85016
Attorney for East Group Properties, L.P.

by: Carol M. Prieur

9

**EXHIBIT "1"**

# LEASE AGREEMENT

THIS LEASE AGREEMENT ("Lease") is made and entered into as of April 5, 2002 by and between EastGroup Properties, L.P., a Delaware Limited Partnership ("Landlord") and Superior Hardwoods, Inc., an Arizona Corporation ("Tenant").

1.     Premises. Landlord, in consideration of the payment of rents and the performance by Tenant of all other terms, covenants and conditions of this Lease, leases to Tenant 56,144 rentable square feet of space, hereinafter referred to as the "Premises," as shown on the attached site plan labeled "Exhibit A", located within Building located at 616 South 55th Avenue, Phoenix, Arizona 85034 (the "Building"). Tenant's Proportionate Share of the Building is 42.87%. The parties agree that for all purposes of this Lease the square footage of the Premises shall be as stipulated above.

2.     Term. The term of this Lease shall commence December 1, 2002 (the "Commencement Date"), and ending on the 60th full calendar month thereafter. This period, including any renewals or extensions subsequently enacted pursuant to the terms of this Lease, shall be referred to as the "Lease Term."

The Commencement Date, Base Rent Schedule, and various terms of the Improvements per Exhibit C are predicated on Landlord obtaining access to the Premises from a third party tenant on or before September 1, 2002. In the event Landlord's access is denied until October 1, 2002, then all referenced dates shall be moved forward by one month. In the event Landlord's access is denied Landlord until November 1, 2002, then all referenced dates shall be moved forward by two months and Landlord shall pay Tenant the sum of $4,400 as compensation for Tenant paying holdover rent to another landlord. In the event Landlord's access is denied Landlord until December 1, 2002, then all referenced dates shall be moved forward by three months and Landlord shall pay Tenant the sum of $8,800 as compensation for Tenant paying holdover rent to another landlord. In the event Landlord's access is denied Landlord until January 1, 2003, then Landlord shall pay Tenant the sum of $13,200 as compensation for Tenant paying holdover rent to another landlord and this Lease shall terminate and be of no further force or effect.

3.     Base Rent. Tenant shall pay to Landlord in advance, without demand, deduction or set-off, monthly installments of Base Rent as set forth in Paragraph 4 below on or before the first day of each calendar month in lawful money of the United States at such place as Landlord designates in writing. Base Rent for fractional months shall be prorated. If Tenant is delinquent in any monthly installment of Base Rent or estimated Operating Expenses for more than 5 days following written notice, then Tenant shall pay to Landlord a late charge equal to three percent (3%) of the total sum due. Said late charge shall be in addition to any other rights and remedies available to Landlord hereunder or at law and shall not be construed as a penalty.

4.     Base Rent Schedule. Base Rent during the Lease Term shall be as set forth below:

| | |
|---|---|
| December 1, 2002 through January 31, 2003 | $0 |
| February 1, 2003 through November 30, 2003 | $15,720.32 |
| December 1, 2003 through November 30, 2004 | $16,281.76 |
| December 1, 2004 through November 30, 2005 | $16,843.20 |
| December 1, 2005 through November 30, 2006 | $17,404.64 |
| December 1, 2006 through November 30, 2007 | $17,966.08 |

5.     Security Deposit. Tenant shall, upon the execution of this Lease, deposit with Landlord as security for the payment of rent and the performance of all other covenants to be performed by Tenant, the sum of $10,000. The Security Deposit shall be non-interest bearing. If Tenant remains in default of any terms or provisions of this Lease beyond any applicable cure period, Landlord may apply or retain sufficient sums from the Security Deposit towards payment thereof. If Landlord elects to apply all or a part of the Security Deposit, Tenant shall be obliged to immediately replenish the Security Deposit for the amount so applied by Tenant. The Security Deposit shall not be applied to rent except upon approval of Landlord. After all of Tenant's obligations under this Lease have been fulfilled, Landlord shall promptly refund the Security Deposit to Tenant.

6.     Improvements. On the Commencement Date, Landlord shall deliver the Premises broom clean and free of debris with the HVAC, evaporative cooling, loading doors, lighting and building systems in good operating condition. In addition, Landlord shall construct the Improvements outlined and in accordance with the attached Exhibit C.

Case 2:15-bk-01182-BMW    Doc 55    Filed 05/08/15    Entered 05/08/15 15:35:05    Desc
Main Document     Page 11 of 68

7.  Operating Expenses. During each month of the Lease Term, on the same day that Base Rent is due, Tenant shall pay to Landlord an amount equal to 1/12 of the annual cost, as reasonably estimated by Landlord, of Tenant's Proportionate Share of the Operating Expenses for the Building. Payments for any fractional month shall be prorated. The term "Operating Expenses" means all costs and expenses incurred by Landlord with respect to ownership, maintenance and operation of the Building including Taxes, Insurance, Common Area Maintenance, and Management Fee as set forth below:

(a)  Taxes – all taxes, assessments, and governmental charges (collectively "Taxes") that accrue against the property during the Lease Term that are payable by Landlord. Taxes may include fees paid to consultants to reduce Taxes (provided said fees result in an actual reduction in Taxes) and all sales or privilege taxes based on rents. Tenant shall pay directly to the authority all personal property taxes charged or levied against Tenant's furniture, fixtures and equipment in the Premises.

(b)  Insurance – the cost to maintain all insurance payable by Landlord with respect to the Premises.

(c)  Common Area Maintenance - the total annual cost of operating the Building including, but not limited to, landscaping services; sweeping services; commonly metered utilities; water and sewer charges; window cleaning; trash collection; association charges or assessments; maintenance, repair or replacements to the Building, including, without limitation, paving and parking areas, roads, driveways, roofs, exterior painting, utility lines, building mechanical, electrical and plumbing systems; and alterations to comply with municipal requirements.

(d)  Management Fee – property management fees payable at market rates to a property manager, including an affiliate of Landlord.

(e)  Exclusions – Operating Expenses shall not include leasing commissions, costs to renovate space for tenants, debt service under mortgages, ground rent under ground leases, legal costs to enforce leases, penalties resulting from Landlord's failure to timely meet obligations, and costs, reserves or amortization related to capital repairs or capital replacements for Landlord's obligation to maintain the structural soundness of the roof, foundation and exterior walls.

If Tenant's total payments of estimated Operating Expenses for any year are less than Tenant's Proportionate Share of actual Operating Expenses for such year, then Tenant shall pay the difference to Landlord within 30 days after demand, and if more, then Landlord shall promptly refund the difference to Tenant or credit the difference to Tenant's account. For purposes of calculating Operating Expenses, a year shall mean a calendar year, except the first year, which shall begin on the Commencement Date, and the last year, which shall end on the expiration of this Lease. Tenant's obligation to pay its proportionate share of Operating Expenses incurred during the Lease Term shall survive the expiration or termination of this Lease. If requested by Tenant within six months of the delivery of the annual reconciliation, Landlord shall provide or make available the supporting data upon which the actual Operating Expenses were calculated for Tenant's review.

Tenant acknowledges that if the Building is part of a Project, the Project may include the Building and other buildings either already existing or to be constructed in the future. Tenant understands and agrees that, for the purposes of administering the provisions of this Paragraph 7, so long as the Building is owned and/or managed in conjunction with other buildings, Operating Expenses and other costs reimbursable by the Tenant may be paid, recorded and reported on a consolidated overall project basis. Landlord may equitably increase Tenant's Proportionate Share for any item of expense or cost reimbursable by Tenant that relates to a repair, replacement, or service that benefits only the Premises or only a portion of the Building that includes the Premises or that varies with occupancy or use.

8.  Utilities. Tenant shall pay directly to the provider all utilities that are separately metered. If not shared with other tenants as part of Operating Expenses, Tenant shall arrange and pay for trash collection services at the Premises. Commonly metered utilities shall be included as an Operating Expense, and Tenant shall pay its share based on consumption as reasonably determined by Landlord. Landlord may cause at Tenant's expense any utilities to be separately metered or sub-metered or charged directly to Tenant by the provider, if, in Landlord's reasonable judgment, Tenant uses a disproportionate share of the service. If any other tenant's usage of a commonly metered utility is, in Landlord's reasonable judgment, disproportionate, then Landlord will cause that tenant to install a separate meter or sub-meter at no cost to Tenant. No interruption or failure of utilities shall result in the termination of this Lease or abatement of rent. Tenant agrees to limit use of water and sewer for normal restroom use.

9.    Insurance.  Landlord shall maintain all risk property insurance covering the full replacement cost of the Building. Landlord may maintain other insurance coverage it deems necessary including, but not limited to, commercial liability insurance and rent loss insurance.  Tenant shall also reimburse Landlord for any increased premiums or additional insurance, which Landlord reasonably deems necessary as a result of Tenant's use of the Premises.

Tenant, at its expense, shall maintain during the Lease Term commercial liability insurance with a minimum limit of $2,000,000 for personal injuries, and deaths, and property damage occurring on the Premises.  Such insurance shall include contractual liability coverage insuring Tenant's indemnity obligations under this Lease.  The commercial liability policy shall name Landlord as an additional insured, be issued by a company reasonably acceptable to Landlord, provide primary coverage if Landlord's policy provides similar coverage, and shall not be cancelable unless thirty day's prior written notice is given to Landlord.  Tenant shall provide Landlord with a certificate of insurance prior to the Commencement Date and upon each renewal of the policy.

Tenant, at its expense, shall maintain during the Lease Term all risk property insurance covering the full replacement cost of all property and improvements installed or placed in the Premises by Tenant at Tenant's expense, including its furniture, fixtures, inventory, equipment, supplies and personal property.

Landlord and Tenant each waives any claim, loss or cost it might have against the other for any personal injury or death, or damage to or theft, destruction, loss, or loss of use of any property (a "Loss"), to the extent the same is insured or required to be insured under any all risk property damage insurance policy covering the Premises, Building, Project, fixtures, personal property, improvements, or business, regardless of whether the negligence of the other party caused such Loss.

10.    Use.  The Premises shall be used only for the purpose of receiving, storing and shipping of materials and merchandise made, assembled or distributed by Tenant and related office uses necessitated thereby.  Additionally, Tenant's use may include processing of wood products utilizing planing and molding machines.  Tenant will use the Premises in a careful, safe and proper manner and will not commit waste, overload the floor or structure or otherwise damage the Premises.  Tenant shall not permit any objectionable or unpleasant odors, smoke, dust, gas, noise, or vibrations to emanate from the Premises, or take any other action that would constitute a nuisance or would unreasonably disturb, unreasonably interfere with, or endanger Landlord or other tenants in the Building or Project.  Tenant shall occupy the Premises in compliance with all laws, codes, ordinances, and regulations now or hereafter applicable to the Premises or Building.  Tenant shall have exclusive use of the outside storage area in the fenced yard on the north side of the Building for storage of product and trailers.  Tenant may store overnight in the normal course of its business one operative tractor/trailer or truck for each dock high loading position on the east side of the Premises, provided this overnight storage does not interfere with other tenants use of the Building.

11.    Parking.  Tenant shall be entitled to 25 unreserved parking spaces for operative automobiles and pick up trucks in those areas designated by Landlord for non-reserved parking.  Landlord may allocate parking spaces amongst Tenant and other tenants in the Building or Project if Landlord determines that such parking facilities are becoming crowded.  However, Landlord shall not be responsible for enforcing Tenant's parking rights against third parties.  No vehicle abandoned or disabled or in a state of non-operation or disrepair shall be left at the Building or Project; Landlord reserves the right to remove said vehicle at the owner's expense.

12.    Exemption of Landlord from Liability; Indemnification.  Tenant hereby agrees that Landlord and its agents and employees shall not be liable for injury to Tenant's business including loss of income for damage to goods, wares, merchandise, or other property of Tenant, Tenant's employees, invitees, customers, or any other person in or about the Premises, nor shall Landlord be liable for injury to the person of Tenant, Tenant's agents, employees, contractors, or invitees, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water, or rain, or from the breakage, leakage, obstruction, or other defects of pipes, sprinklers, wires, appliances, plumbing, HVAC, or light fixtures, or from any other cause whether said damage or injury results from conditions arising upon the Premises or other portions of the Building or Project, or from other sources or places, and regardless of whether the cause of such damage or injury or the means of repairing the same is inaccessible to Tenant.  Landlord shall not be liable for any damages arising from any act or neglect of any other tenant of the Building or Project.

Except for the gross negligence or willful misconduct of Landlord, its agents, employees or contractors, Tenant agrees to indemnify, defend and hold harmless Landlord, and Landlord's agents, employees, and contractors, from and against any and all losses, liabilities, damages, costs and expenses (including reasonable attorney's fees) resulting from claims by third parties for injuries to any person and damage to or theft or misappropriation or loss of property occurring in or about the Building and arising from the use and occupancy of the Premises or from any activity, work or thing done, permitted or suffered by Tenant in or about

the Premises or due to any act or omission of Tenant, its subtenants, assignees, invitees, employees, contractors, and agents. The furnishing of any required insurance shall not be deemed to limit Tenant's obligations under this paragraph.

13.     Repairs. Landlord shall maintain, at its expense, the structural soundness of the roof, foundation, and exterior walls of the Building in good repair, reasonable wear and tear and damages caused by Tenant, its agents, invitees and contractors, excepted. The term "walls" as used in paragraph shall not include windows, doors, store-fronts, overhead doors, dock bumpers, dock seals, dock plates, or dock levelers. Tenant shall promptly give Landlord written notice of any repair required by Landlord, and Landlord shall proceed with due diligence to make such repair.

Tenant, at its expense, shall repair, replace and maintain in good condition all portions of the Premises and all areas, improvements and systems exclusively serving the Premises, including, without limitation, dock and loading areas, truck doors, plumbing, water and sewer lines up to points of common connection, fire protection systems, entries, doors, ceilings, roof membrane, windows, interior walls, demising walls, HVAC systems, and evaporative coolers. Such repairs and replacements may include capital expenditures whose benefit may extend beyond the Lease Term; provided, however, Tenant's share of any capital expenditures or major repairs will be confined to Tenant's proportional share (based on the remaining years of the Lease Term) of the amortized cost of the item over its useful life. If Tenant fails to perform any repair or replacement for which it is responsible, Landlord may perform such work and be reimbursed by Tenant within 30 days after written demand. If any of Tenant's obligations hereunder affect other tenants or portions of the Building, Landlord may perform the repair or replacement and include the cost as part of Operating Expenses or allocate the cost to tenants as may be appropriate.

Tenant shall enter into a maintenance service contract with a vendor reasonably acceptable to Landlord to periodically service the HVAC and evaporative coolers in the Premises in accordance with a scope of services reasonably prescribed by Landlord. Tenant shall supply Landlord a copy of the contract upon request as evidence of compliance.

14.     Compliance with Laws and Regulations. Tenant shall comply with all Federal, State, County and City laws, ordinances, rules and regulations affecting or respecting the use or occupancy of the Premises by the Tenant or the business at any time thereon transacted by the Tenant, and Tenant shall comply with all rules in effect or which may be hereafter adopted by Landlord for the protection, welfare and orderly management of the Building and its tenants or occupants.

15.     Holding Over. Tenant has no right to retain possession of the Premises beyond the expiration or termination of this Lease. In the event that Tenant holds over, Base Rent shall be increased to 135% of the Base Rent applicable immediately preceding the expiration or termination plus all other payments required under the Lease. Nothing contained in this paragraph or Lease shall be construed as Landlord's consent to holding over.

16.     Signs. Tenant shall not make changes to the exterior of the Premises, Building or grounds including the installation of signs, placards or other advertising media without Landlord's prior written consent. Any approved sign shall be installed by Tenant, at its expense, and shall be in accordance with Landlord's sign criteria and applicable municipal regulations. Tenant shall maintain signs in good condition and repair any damage upon removal at the expiration or earlier termination of this Lease.

17.     Quiet Enjoyment. Subject to payment of rent and performance by Tenant of all the terms, conditions and covenants of the Lease, Tenant shall have peaceful and quiet enjoyment of the Premises during the Lease Term.

18.     Force Majeure. Except for Tenant's obligation to pay rent and other monetary obligations under this Lease, the parties shall not be held responsible for delays in the performance of their obligations hereunder when caused by strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials, or reasonable substitutes thereof, governmental restrictions, governmental regulations, governmental controls, delay in issuance of permits, acts of war, civil commotion, fire or other casualty, and other causes beyond the reasonable control of the parties ("Force Majeure").

19.     Assignment and Subletting. Tenant shall not assign this Lease nor sublet all or any part of the Premises without first securing Landlord's written consent, which consent shall not be unreasonably withheld or delayed. In the event of an assignment or subletting, the assignee and/or subtenant shall first assume in writing all of the obligations of Tenant under this Lease and Tenant shall, for the full Lease Term, continue to be jointly and severally liable with such assignee or subtenant for the payment of rents and the performance of all obligations required of Tenant under this Lease. Tenant hereby acknowledges that the use to which the Premises are put, the compatibility of any occupant of the Premises with other tenants, and the ability to pay rent when due are of prime importance and significance to the Landlord in the operation and maintenance of the Building in which the

NNN WDP 1.0
Page 4

Premises are located. Each request for consent to an assignment or subletting shall be in writing and include a fee of $350 as consideration for Landlord considering and processing said request. In the event the rent payable by an assignee or subtenant exceeds the rent payable under this Lease, Tenant shall pay to Landlord as additional rent one half of the excess rent or other consideration. Notwithstanding the above, Tenant may assign or sublet the Premises to any entity controlling Tenant, controlled by Tenant, or under common control with Tenant, without the prior consent of Landlord. Landlord's consent to a transfer shall not be required in the event of a bonafide sale of all or substantially all of the Tenant's assets or outstanding shares; provided, however, that said transfer or sale shall be for a good business purpose and not principally for the purpose of transferring the leasehold estate. In the event Tenant obtains commercial financing secured by an encumbrance of Tenant's stock and/or assets, it shall constitute a permitted transfer which does not require the prior written consent of Landlord so long as the encumbrance does not give any secured party any rights under the Lease.

20.     Casualty and Restoration. If during the Lease Term all or a part of the Premises should be destroyed partially or totally by fire or other casualty, Landlord shall notify Tenant within 30 days after such damage as to the amount of time Landlord reasonably estimates it will take to restore the Premises. If the restoration time is estimated to exceed 180 days, either party may terminate this Lease by promptly notifying the other party and this Lease shall be terminated effective as of the date of the casualty. If neither party elects to terminate the Lease or if Landlord estimates that restoration will take 180 days or less, then Landlord shall, subject to Force Majeure events and except for improvements made by or paid for by Tenant, restore Premises within 180 days following such destruction to substantially the same condition in which it existed at the time immediately preceding such destruction. Tenant's obligation to pay Base Rent and Operating Expenses shall abate for the period of repair in proportion, which the area of the Premises that is not useable by Tenant bears to the total area of the Premises. Notwithstanding the foregoing, either party may terminate this Lease if the Premises are damaged during the last year of the Lease Term and Landlord reasonably estimates that it will take more than 60 days to repair such damage.

21.     Eminent Domain. If the whole of the Premises shall be taken by any public authority under the power of eminent domain, or if so much of the Building or grounds shall be taken by any such authority under the power of eminent domain so that the Tenant cannot continue to operate its business in the Premises, then the Lease Term of this Lease shall cease as of the day possession is taken by such public authority and rents shall be paid up to that day with proportionate refund by Landlord of any such rents as may have been paid in advance or deposited as security. The amount awarded for any taking under the power of eminent domain shall belong to and be the property of the Landlord. Nothing herein shall limit the Tenant's ability to make an independent claim for damages or awards.

22.     Waiver. No waiver of any of the covenants and agreements here contained or of any breach thereof shall be taken to constitute a waiver of any other subsequent breach of such covenants and agreements or to justify or authorize the non-observance at any time of the same or of any other covenants and agreements hereof.

23.     Limitation of Landlord's Liability. Landlord shall only be responsible for all its obligations under this Lease arising during its period of ownership of the Building. Any liability of the Landlord under this Lease shall be limited solely to its interest in the Building, and in no event shall any personal liability be asserted against Landlord in connection with this Lease nor shall any recourse be had to any other property or assets of Landlord. In no event shall any obligation or liability whatsoever of EastGroup Properties, Inc., a Maryland real estate investment trust be personally binding on any director, officer or shareholder.

24.     Subordination. This Lease is subject and subordinate to all mortgages, which may now or hereafter affect the Premises or the Building of which it forms a part, and to all renewals, modifications, consolidations, replacements and extensions thereof. This clause shall be self-operative and no further instrument of subordination shall be required. In confirmation of such subordination, Tenant shall execute promptly any subordination certificate that Landlord may subsequently request; provided, however, that Tenant may condition such subordination upon the execution and delivery by the applicable mortgage holder of a so-called "non-disturbance" agreement in customary form.

25.     Alterations and Trade Fixtures. Tenant shall not make any alterations, additions or improvements ("Alterations") to the Premises or Building without Landlord's prior written consent. Notwithstanding the foregoing, Tenant may make Alterations to the interior of the Premises which are both decorative in nature and cost less than $5,000 without Landlord's consent, provided such Alterations do not involve any structural elements of the Building, pierce the roof membrane, or modify the utility systems of the Building. Alterations approved by Landlord shall comply with all applicable codes and municipal requirements and be installed with commercial grade materials in a good and workmanlike manner by a contractor reasonably acceptable to Landlord. Tenant shall furnish security or make other arrangements satisfactory to Landlord to assure payment for the completion of work

free and clear of liens and shall provide certificates indicating insurance sufficient to protect Landlord from any liability or damages during construction. Upon surrender of the Premises, all Improvements and Alterations shall remain on the Premises as Landlord's property, except to the extent Landlord requires removal at Tenant's expense. Tenant may at any time request in writing Landlord's determination as to whether an Improvement or Alteration shall become property of Landlord. Tenant, at its own cost and expense, may erect shelves, bins, machinery and trade fixtures ("Trade Fixtures") in the ordinary course of its business provided that such items do not alter the basic character of the Premises, do not overload or damage the Premises, and may be removed without damage to the Premises. The installation of Trade Fixtures must comply with all codes and municipal requirements. Tenant shall remove its Trade Fixtures upon surrender of the Premises and repair any damage caused by the removal.

26.    Surrender of Premises. Upon termination of the Lease Term or earlier termination of Tenant's right of possession, Tenant shall surrender the Premises to Landlord in the same condition as received, broom clean and free of debris with the HVAC, evaporative cooling, loading doors, lighting and building systems in good operating condition, ordinary wear and tear and casualty loss and condemnation excepted. Any Alterations or Trade Fixtures not removed as required shall be deemed abandoned and may be removed, stored or disposed of by Landlord at Tenant's expense. All obligations of Tenant not fully performed as of the termination of the Lease Term shall survive the termination of the Lease Term, including without limitation, indemnity obligations, monetary obligations, and obligations concerning repair of the Premises.

27.    Inspection and Access. Landlord or its agents shall have the right to enter the Premises after telephonic notice to Tenant during normal business hours, except in the case of emergencies where notice and time restrictions shall not be imposed, to inspect and make repairs to the Premises or the Building. Within 9 months prior to the date of the expiration of the Lease, Landlord or its agents shall have the right to enter the Premises without notice during normal business hours for the purpose of showing the Premises to prospective tenants or purchasers. Landlord may grant easements, make public dedications, designate common areas and create restrictions on or about the Premises, Building or Project, provided that no such easement, dedication, designation or restriction materially interferes with Tenant's use or occupancy of the Premises. At Landlord's request, Tenant shall execute such instruments as may be necessary for such easements, dedications, or restrictions.

28.    Events of Default. Each of the following events shall be an event of default ("Event of Default") by Tenant under this Lease:

(a)    Tenant shall fail to pay Base Rent or any other payment required herein when due, and such failure shall continue for a period of 5 days following written notice from Landlord to Tenant.

(b)    Any insurance required to be maintained by Tenant pursuant to this Lease shall be terminated or cancelled or shall expire or shall be reduced below the limits specified in this Lease.

(c)    Tenant shall attempt or there shall occur any assignment, sublease or other transfer of Tenant's interest in this Lease except as is otherwise permitted in this Lease.

(d)    The appointment of a trustee or a receiver to take possession of all or substantially all of Tenant's property, or the attachment, execution or other judicial seizure of all or substantially all of Tenant's assets located at the Premises, unless such appointment, attachment, execution or seizure is discharged within thirty (60) calendar days after the appointment, attachment, execution or seizure.

(e)    The institution of bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or any other proceedings for relief under any bankruptcy or insolvency law or any other similar law for the relief of debtors, by or against Tenant, and if instituted against Tenant, the same are not dismissed within thirty (60) calendar days after the institution of such proceedings.

(f)    Tenant shall fail to comply with any provision of this Lease other than those specifically referred to in this Paragraph 28, and except as otherwise expressly provided herein, such default shall continue for more than 30 days after Landlord shall have given Tenant written notice of such default (unless such performance due to the nature of the obligation, requires a period of time in excess of 30 days, then after such period of time as is reasonably necessary).

29.    Landlord's Remedies.  On the occurrence of any such Event of Default, Landlord shall, in addition to any other rights or remedies available to Landlord under this Lease and under the laws of the state in which the Premises are located, have the following rights and remedies:

(a)    Termination of Lease.  Landlord may terminate this Lease and Tenant's right of possession by giving Tenant written notice indicating the date upon which this Lease is terminated.  Upon such termination, Landlord shall be entitled to recover from Tenant the following amounts: (i) all accrued and unpaid Base Rent, Operating Expenses, and other sums provided for in this Lease to the date of such termination; (ii) the unamortized cost to Landlord, computed and determined in accordance with generally accepted accounting principles, of the Improvements paid for and installed by Landlord pursuant to this Lease; (iii) the costs incurred by Landlord to relet the Premises or a portion thereof, including brokers commissions, repairs, alterations, improvements, and costs to remove and store Tenant's property; (iv) the positive difference, if any, of the present value of the Base Rent pursuant to this Lease for the remainder of the Lease Term had this Lease not been terminated less the present value of the then fair market rental value for the Premises for the remainder of the Lease Term had this Lease not been terminated, such present value computed in each case using 9%; and (v) any damages in addition thereto, including reasonable attorneys' fees and court costs, which Landlord shall have sustained by reason of the breach of any of the terms, conditions and covenants of this Lease.

(b)    Re-Entry Without Termination.  Landlord may re-enter the Premises without terminating this Lease, and remove all property from the Premises, and relet the Premises or any part thereof for the account of Tenant, upon such terms as Landlord in Landlord's sole discretion shall determine.  Landlord shall not be required to accept any tenant offered by Tenant or to observe any instructions given by Tenant relative to such reletting.  In the event of any such reletting, Landlord may make repairs, alterations, and additions to the Premises to the extent deemed reasonably necessary by Landlord, and Tenant shall upon demand pay the cost thereof.  Landlord may collect the rents from any such reletting and apply the same first to the payment of the repairs, alterations, additions, expenses of re-entry, attorney's fees and court costs, leasing commissions and second to the payment of Base Rent and Operating Expenses herein provided to be paid by Tenant, and any excess or residue shall operate only as an offsetting credit against the amount of Base Rent and Operating Expenses as the same thereafter becomes due and payable hereunder.  No such re-entry or repossession, repairs, alterations and additions or reletting shall be construed as an eviction or ouster of Tenant or as an election on Landlord's part to terminate this Lease unless a written notice of such intention be given to Tenant, nor shall the same operate to release the Tenant in whole or in part from any of the Tenant's obligations hereunder, and Landlord may, at any time and, from time to time, sue and recover judgment for any deficiencies from time to time remaining after the application from time to time of the proceeds of any such reletting.

(c)    Other.  Landlord may pursue any other remedy now or hereafter available to Landlord under the laws in which the Premises are located.  The failure of Landlord at any time to enforce its rights under this Lease shall not be construed as having created a custom that modifies the terms, conditions or covenants of the Lease.  The rights, privileges, elections and remedies of Landlord under this Lease shall be cumulative, and Landlord shall have the right to exercise such remedies at any time and from time to time singularly or in combination.  If Landlord exercises either of the remedies provided for in subparagraphs (a) and (b) hereinabove, Tenant shall surrender possession and vacate the Premises immediately and deliver possession thereof to Landlord, and Landlord may then or at any time thereafter re-enter and take complete and peaceful possession of the Premises.

30.    Liens.  Tenant has no express or implied authority to create or place any lien or encumbrance of any kind upon, or in any manner to bind the interest of Landlord or Tenant in, the Premises or to charge the rentals payable hereunder for any claim in favor of any person dealing with Tenant, including those who may furnish materials or perform labor for any construction or repairs.  Tenant covenants and agrees that it will pay or cause to be paid all sums legally due and payable for labor performed or materials furnished in connection with any work performed on the Premises and that it will save and hold Landlord harmless from all loss, cost or expense based on or arising out of asserted claims or liens against the leasehold estate or against the interest of Landlord in the Premises under this Lease.  Tenant shall give Landlord immediate written notice of the placing of any lien or encumbrance against the Premises and cause such lien or encumbrance to be discharged within 30 days of the filing or recording; provided, however, Tenant may contest such liens or encumbrances as long as such contest prevents foreclosure of the lien or encumbrance and Tenant causes such lien or encumbrance to be bonded or insured over in a manner satisfactory to Landlord within such 30 day period.

31.    Estoppel Certificate.  The parties shall within 10 business days after written notice from the other party execute and deliver an estoppel certificate confirming to others that this Lease is in full force and effect, that neither party is in default and other such factual information as may be reasonably required.

32.    Hazardous Material.  Tenant has requested Landlord's consent to store and distribute limited quantities of adhesives, lacquers and stains in prepackaged containers. Landlord consents provided Tenant does not blend, mix, re-package, or manufacture these products. Except as stated above and for Hazardous Materials contained in products used by Tenant in de minmis quantities for ordinary cleaning, maintenance of equipment, or office purposes, and except for Hazardous Materials contained in wood products or result as a by-product thereof, such as formaldehyde and wood dust, Tenant shall not permit or cause any party to bring any Hazardous Materials upon the Premises or transport, store, use, generate, manufacture or release any Hazardous Material in or about the Premises without Landlord's prior written consent. If Hazardous Materials storage is approved by Landlord, Tenant shall at all times operate in strict compliance with all applicable federal, state, and local laws, rules, regulations, and orders. For purposes of this provision, the term "Hazardous Materials" shall mean and refer to any waste, pollutant, material, or contaminant, or other substance of any kind or character that are or become regulated as hazardous or toxic waste or substance, or which require special handling or treatment, under any applicable local, state, or federal law, rule, regulation, or order. Landlord shall at all times have access to the Premises and a right to perform inspections and tests with respect to Hazardous Materials. Tenant, at its sole cost and expense, shall remediate in a manner satisfactory to Landlord any release of Hazardous Materials at the Building by Tenant, its agents, employees, contractors, subtenants, or invitees.

Tenant shall indemnify, defend, and hold harmless Landlord from and against any of the following which arises during or as a result of Tenant's occupancy of the Premises: (a) any loss, cost, expense, claim, or liability arising out of any investigation, monitoring, clean-up, containment, removal, storage, or restoration work (herein referred to as "Remedial Work") required by, or incurred by Landlord or any other person or party in a reasonable belief that such Remedial Work is required by any applicable federal, state or local law, rule, regulation or order, or by any governmental agency, authority, or political subdivision having jurisdiction over the Premises, and (b) any claims of third parties for loss, injury, expense, or damage arising out of the presence, release, or discharge of any Hazardous Materials on, under, in, above, to, or from the Premises. In the event any Remedial Work is so required under any applicable federal, state, or local law, rule, regulation or order, Tenant shall promptly perform or cause to be performed such Remedial Work in compliance with such law, rule, regulation, or order. In the event Tenant shall fail to commence the Remedial Work in a timely fashion, or shall fail to prosecute diligently the Remedial Work to completion, such failure shall constitute an event of default on the part of Tenant under the terms of this Lease, and Landlord, in addition to any other rights or remedies afforded it hereunder, may, but shall not be obligated to, cause the Remedial Work to be performed, and Tenant shall promptly reimburse Landlord for the cost and expense thereof upon demand. Landlord will not assert a claim against Tenant for Hazardous Materials which are not caused by Tenant, its agents, employees, contractors, subtenants, assignees or invitees, or which were released prior to this Lease Term.

33.    Miscellaneous.

      (a)    The parties waive their respective rights to a trial by jury in any action or proceeding involving the Premises or arising out of this Lease. In the event of any legal action or proceeding is brought by either party to enforce this Lease, the non-prevailing party shall pay all expenses of the prevailing party incurred in connection with such action or proceeding, including court costs and reasonable attorneys' fees.

      (b)    The parties agree that in the event any clause or provision of this Lease is ruled illegal, invalid or unenforceable under present or future laws, then such portion shall be deemed severable, and it shall not invalidate or impair the Lease as a whole or any other provision of the Lease.

      (c)    All provisions of this Lease to be observed or performed by Tenant are both covenants and conditions. In construing this Lease, all heading and titles are for convenience of the parties only. Whenever required by the context, the singular shall mean plural and vice versa. The normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Lease.

      (d)    Landlord shall have the right, at any time without liability to Tenant, to make, at Landlord's own expense, repairs, alterations, additions and improvements, structural or otherwise, in or to the Premises, Building or Project,

provided that Landlord shall use commercially reasonable efforts to minimize the inconvenience or annoyance to Tenant during construction as is dictated by the circumstances.

(e) Time is of the essence of each and every provision of this Lease.

(f) This Lease constitutes the entire agreement between the parties and supersedes all promises, representations, negotiations and prior agreements. No waiver, modifications, additions or addenda to this Lease shall be valid unless in writing and signed by both the Landlord and the Tenant.

(g) This Lease shall be binding upon and inure to the benefit of the heirs, legal representatives, successors and assigns of the parties, and this Lease shall be governed by and construed in accordance with the laws of the state in which the Premises are located.

(h) Any payments or charges due from Tenant to Landlord hereunder shall be considered rent for all purposes of this Lease.

(i) Each individual executing this Lease represents and warrants that he or she is duly authorize to do so.

(j) Preparation and submission of this Lease by Landlord to Tenant shall not be deemed an offer. This Lease is not intended to be binding until executed and delivered by all parties hereto.

(k) If and when included within the term "Tenant" as used in this instrument, there is more than one person, firm or corporation, each shall be jointly and severally liable for the obligations of Tenant.

(l) Upon execution and delivery of the Lease and occupancy of Premises, Landlord shall pay the following real estate brokers a commission per separate agreement: Insignia/ESG represents both Landlord and Tenant as a dual agent. The parties represent and warrant to the other that it has had no dealings with any other broker or brokers except as listed above in connection with this Lease. The parties agree to indemnify, defend and hold the other harmless from and against any liability or claim for compensation made by any unnamed broker.

(m) All notices required under this Lease to be given to Tenant shall be given to it at the Premises and at Monadnock Forest Products, Inc., Attn: President, 415 Squantum Road, Jaffrey, NH 03452 or at such other place as Tenant may designate in writing. Any such notice to be given to Landlord under this Lease shall be given to it at 2200 East Camelback Road, Suite 210, Phoenix, Arizona 85016, Attn: Asset Manager and 188 Capitol Street, Suite 300, Jackson, Mississippi 39201, Attn: President or at such other place as Landlord may designate in writing. All notices shall be in writing and shall be sent by certified mail, postage prepaid, or by personal delivery, or by commercial courier. Notices shall be deemed to have been given (i) in the case of mailing, when postmarked, or (ii) in the case of hand delivery or delivery by commercial courier, when delivered.

34. Exhibits. The Exhibits listed below are incorporated into and made a part of this Lease:

   Exhibit A - Premises
   Exhibit B - Rules and Regulations
   Exhibit C – Improvements
   Exhibit D – Guaranty of Lease Agreement
   Exhibit E – Option to Renew

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the date written on Page 1.

**LANDLORD**

EastGroup Properties, L.P., a Delaware Limited
Partnership

By: _____

William D. Petsas
Senior Vice President

**TENANT**

Superior Hardwoods, Inc., an Arizona Corporation

By: _____

Norman Hansen, Jr.
President

## Exhibit B
## Rules and Regulations

1. The sidewalk, entries, and driveways of the Project shall not be obstructed by Tenant, or its agents, or used by them for any purpose other than ingress and egress to and from the Premises.

2. Tenant shall not place any objects, such as, outdoor furniture, etc., in the parking areas, landscaped areas or other areas outside of its Premises, or on the roof of the Project. Landlord consents to Tenant's installation of security cameras. Any communication antennas or dishes will need to be properly screened and installed in a manner that will not damage the roof membrane and structure.

3. Except for seeing-eye dogs, no animals shall be allowed in the offices, halls, or corridors in the Project.

4. Tenant shall not disturb the occupants of the Project or adjoining buildings by the use of any radio or musical instrument or by the making of loud or improper noises.

5. If Tenant desires telegraphic, telephonic or other electric connections in the Premises, Landlord or its agent will direct the electrician as to where and how the wires may be introduced; and, without such direct, no boring or cutting of wires will be permitted. Any such installation or connection shall be made at Tenant's expense.

6. Tenant shall not install or operate any steam equipment or boiler. The use of oil, gas or inflammable liquids for heating, lighting or any other purpose, except lubricating machinery, is expressly prohibited. Explosives or other articles deemed extra hazardous shall not be brought into the Project.

7. Parking any type of recreational vehicles is specifically prohibited on or about the Project. Except for the overnight parking of operative vehicles, no vehicle of any type shall be stored in the parking areas at any time. In the event that a vehicle is disabled, it shall be removed within 48 hours. There shall be no "For Sale" or other advertising signs on or about any parked vehicle. All vehicles shall be parked in the designated parking areas in conformity with all signs and other markings. All parking will be open parking, and no reserved parking, numbering or lettering of individual spaces will be permitted except as specified by Landlord.

8. Tenant shall maintain the Premises free from rodents, insects and other pests.

9. Landlord reserves the right to exclude or expel from the Project any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs or who shall in any manner do any act in violation of the Rules and Regulations of the Project.

10. Tenant shall not cause any unnecessary labor by reason of Tenant's carelessness or indifference in the preservation of good order and cleanliness. Landlord shall not be responsible to Tenant for any loss of property on the Premises, however occurring, or for any damage done to the effects of Tenant by the janitors or any other employee or person.

11. Tenant shall give Landlord prompt notice of any defects in the water, lawn sprinkler, sewage, gas pipes, electrical lights and fixtures, heating apparatus, or any other service equipment affecting the Premises.

12. Tenant shall not permit storage outside the Premises or dumping of waste or refuse or permit any harmful materials to be placed in any drainage system or sanitary system in or about the Premises.

13. All moveable trash receptacles provided by the trash disposal firm for the Premises must be kept in the trash enclosure areas, if any, provided for that purpose.

14. No auction, public or private, will be permitted on the Premises or the Project.

15. No awnings shall be placed over the windows in the Premises except with the prior written consent of Landlord.

16. The Premises shall not be used for lodging, sleeping or cooking or for any immoral or illegal purposes or for any purpose other than that specified in the Lease. No gaming devices shall be operated in the Premises.

17. Tenant shall ascertain from Landlord the maximum amount of electrical current, which can safely be used in the Premises, taking into account the capacity of the electrical wiring in the Project and the Premises and the needs of other tenants, and shall not use more than such safe capacity. Landlord's consent to the installation of electric equipment shall not relieve Tenant from the obligation not to use more electricity than such safe capacity.

18. Tenant assumes full responsibility for protecting the Premises from theft, robbery and pilferage.

# Exhibit C
## Improvements

Landlord agrees to furnish or perform at Landlord's sole cost and expense those items of construction and those improvements (the "Improvements") specified below:

- Make the office improvements per the attached Exhibit C.1., including painting, plumbing and electrical work.
- Expand the southernmost rail door on the west side to 16' wide by 14' high
- Expand the easternmost grade door on the north side to 18' wide
- Extend with additional concrete the exterior rail platform on the north side of the building so that rail loading may occur. Add approximately 2,000 square feet of additional concrete to widen the area where forklifts will serve the exterior loading platform. Add a gate to the fence to make it function with rail loading.

Landlord shall proceed with and complete the construction of the Improvements with diligence commencing during August 2002. Tenant shall be allowed to install its own improvements, machinery, equipment, fixtures, or other property on the Premises starting September 1, 2002 provided that Tenant does not thereby interfere with the completion of construction or cause any labor dispute as a result of such installations or delay Landlord's work in any way.

Tenant shall so advise Landlord in writing and Landlord shall determine whether such changes can be made in a reasonable and feasible manner. Any and all costs of making any changes to the Improvements which Tenant may request and which Landlord may agree shall be at Tenant's sole cost and expense and shall be paid to Landlord upon demand and before execution of the change order.

The failure of Tenant to take possession of or to occupy the Premises shall not serve to relieve Tenant of the obligations arising on the Commencement Date or delay the payment of rent by Tenant. Subject to applicable ordinances and building codes governing Tenant's right to occupy or perform in the Premises. Except for incomplete punch list items, Tenant upon the Commencement Date shall have and hold the Premises as the same shall then be without any liability or obligation on the part of the Landlord for making any further alterations or improvements of any kind in or about the Premises.

Landlord shall provide Tenant with an Allowance up to $50,000 to be used by Tenant for including, but not limited to, floor coverings, displays, cabinetry, racking, signage, and moving expenses. Landlord shall pay the Allowance in two installments; the first on October 1, 2002 and the second on December 1, 2002.

NNN WDP 1.0
Page 14

**Exhibit A**
**Premises**

The Premises contain 56,144 rentable square feet and is known by the following street address 616 South 55th Avenue, Phoenix, Arizona 85034.





Exhibit C.1

Notes:

A. Use an existing window that was relocated.

B. New window provided by Tenant. Landlord to frame and provide/install glass.

C. New door and frame provided by Tenant.

D. Pony Wall 42" high to support a counter that will be 44" high. Tenant to supply and install counter.

4. - 6'² WINDOWS

4. - 3' OR BLDG STAND. DOORS

* - BLUE INDICATES NEW WALLS
  - WALLS THAT PERMIT 4-1/2 TIGHT TO GLASS
  - BLUE INDICATES NEW DOORS & WINDOWS

## Exhibit D
## GUARANTY OF LEASE AGREEMENT

WHEREAS, EastGroup Properties, L.P., a Maryland Limited Partnership, hereinafter "Landlord", and Superior Hardwoods, Inc., an Arizona Corporation, hereinafter "Tenant", are about to execute a document entitled "Lease Agreement" dated March 1, 2002 concerning the premises commonly known as 616 South 55th Avenue, Phoenix, Arizona 85034 wherein Landlord will lease the premises to Tenant, and WHEREAS, Monadnock Forest Products, Inc., a New Hampshire Corporation, hereinafter "Guarantors" have a financial interest in Tenant, and WHEREAS, Landlord would not execute the Lease Agreement ("Lease") if Guarantors did not execute and deliver to Landlord this Guarantee of Lease.

NOW THEREFORE, in consideration of the execution of the foregoing Lease by Landlord and as a material inducement to Landlord to execute said Lease, Guarantors hereby jointly, severally, unconditionally and irrevocably guarantee the prompt payment by Tenant of all rents, and all other sums payable by Tenant under said Lease and the faithful and prompt performance by Tenant of each and every one of the terms, conditions and covenants of said Lease to be kept and performed by Tenant.

It is specifically agreed that the terms of the foregoing Lease may be modified by agreement between Landlord and Tenant, and said Lease may be assigned by Landlord or any assignee of Landlord without consent or notice to Guarantors and that this Guaranty shall guarantee the performance of said Lease as so modified.

Landlord shall have the right to proceed against Guarantors hereunder following any breach or default by Tenant without first proceeding against Tenants and without previous notice to or demand upon either Tenant or Guarantors. The Guaranty shall not be released, modified or affected by the failure or delay in the part of Landlord to enforce any of the rights or remedies of the Landlord under said Lease, whether pursuant to the terms thereof or at law or in equity.

No notice of default need to be given to Guarantors, it being specifically agreed that the guarantee of the undersigned is a continuing guarantee under which Landlord may proceed immediately against Tenant and/or against Guarantors following any breach or default by Tenant of for the enforcement of any rights which Landlord may have as against Tenant under the terms of the Lease or at law or in equity.

Guarantor hereby waive (a) notice of acceptance of this Guaranty, (b) demand of payment, presentation and protest, (c) deleted, (d) any right to require the Landlord to proceed against the Tenant or any other Guarantor or any other person or entity liable to Landlord, (e) any right to require Landlord to apply to any default any security deposit or other security it may hold under the lease, (f) any right to require Landlord to proceed under any other remedy Landlord may have before proceeding against Guarantors, (g) any right to subrogation.

Guarantors do hereby subrogate all existing or future indebtedness of Tenant to Guarantors to the obligations owed to Landlord under the Lease and this Guaranty.

The term "Landlord" refers to and means the Landlord named in the Lease and also Landlord's successors and assigns. The term "Tenant" refers to and means the Tenant named in the Lease and also Tenant's successors and assigns.

In the event any action is brought by Landlord against Guarantors to enforce this Guaranty of Lease, the prevailing party shall be entitled to recover reasonable attorney's fees and court costs.

Signature:
By:         Norman Hansen, Jr.
Title:      President
Guarantor:  Monadnock Forest Products, Inc., a New Hampshire Corporation

Address:    415 Squantum Road, Jaffrey, NH 03452

Date:       4-9-02

**Exhibit E**
**Renewal Option**

(a)    Provided that as of the time of the giving of the Extension Notice and the Commencement Date of the Extension Term, (x) Tenant is the Tenant originally named herein, (y) Tenant actually occupies all of the Premises initially demised under this Lease and any space added to the Premises, and (z) no Event of Default exists or would exist but for the passage of time or the giving of notice, or both, then Tenant shall have the right to extend the Lease Term for one additional term of five years (such additional term is hereinafter called the "Extension Term") commencing on the day following the expiration of the Lease Term (hereinafter referred to as the "Commencement Date of the Extension Term"). Tenant shall give Landlord notice (hereinafter called the "Extension Notice") of its election to extend the term of the Lease Term at least 6 months, prior to the scheduled expiration date of the Lease Term.

(b)    The Base Rent payable monthly by Tenant to Landlord during the Extension Term shall be in accordance with the schedule below:

| Year 1 | $18,527.52 |
| Year 2 | $19,088.96 |
| Year 3 | $19,650.40 |
| Year 4 | $20,211.84 |
| Year 5 | $20,773.28 |

(c)    The determination of Base Rent does not reduce the Tenant's obligation to pay or reimburse Landlord for Operating Expenses and other reimbursement items as set forth in the Lease, and Tenant shall reimburse and pay Landlord as set forth in Lease with respect to such Operating Expenses and other items with respect to the Premises during the Extension Term without regard to any cap on such expenses set forth in the Lease.

(d)    Except for the Base Rent as determined above, Tenant's occupancy of the Premises during the Extension Term shall be on the same terms and conditions as are in effect immediately prior to the expiration of the initial Lease Term; provided, however, Tenant shall have no further right to any allowances, credits or abatements or any options to expand, contract, renew or extend the Lease.

(e)    If Tenant does not give the Extension Notice within the period set forth in paragraph (a) above, Tenant's right to extend the Lease Term shall automatically terminate. Time is of the essence as to the giving of the Extension Notice.

(f)    Landlord shall have no obligation to refurbish or otherwise improve the Premises for the Extension Term. The Premises shall be tendered on the Commencement Date of the Extension Term in "as-in" condition.

(g)    If the Lease is extended for the Extension Term, then Landlord shall prepare and Tenant shall execute an amendment to the Lease confirming the extension of the Lease Terms and the other provisions applicable thereto (the "Amendment").

(h)    If Tenant exercises its right to extend the term of the Lease for the Extension Term pursuant to this Addendum, the term "Lease Term" as used in the Lease, shall be construed to include, when practicable, the Extension Term as provided in (d) above.

ρ ν

## THIRD AMENDMENT TO LEASE AGREEMENT

This THIRD AMENDMENT TO LEASE AGREEMENT ("Third Amendment") is entered into as of February 12, 2010, by and between EastGroup Properties L.P., a Delaware limited partnership, herein referred to as "Landlord" and Premiere Hardwoods, LLC, an Arizona limited liability company, herein referred to as "Tenant".

### RECITALS

A.       Landlord and Tenant had previously entered into a Lease Agreement dated April 5, 2002, (which together with any amendments, modification, renewals, and extensions thereof is hereinafter referred to as the "Lease"), by which Landlord leased to Tenant approximately 56,144 rentable square feet at 616 South 55th Avenue, Suite 101, Phoenix, Arizona 85043 (herein referred to as "Premises"). Such terms of the Lease continue in full force and effect and the Lease is incorporated herein by reference.

B.       Landlord and Tenant desire to amend the terms of the Lease upon and subject to the terms and conditions set forth in this Agreement.

NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, THE RECEIPT OF WHICH IS HEREBY ACKNOWLEDGED, and in consideration of the Premises and the mutual covenants contained herein, and intending to be legally bound, Landlord and Tenant hereby agree as follows:

1.  The Term of the Lease is hereby amended by the addition of 24 months such that the Lease shall expire February 28, 2015.

2.  The Base Rent schedule contained in Paragraph 2 of the Second Amendment shall be deleted in its entirety and replaced with the following paragraph:

    Base Rent payable monthly for the period March 1, 2010 through February 28, 2015 shall be in accordance with the schedule below. In addition to Base Rent, Tenant shall pay to Landlord all Operating Expenses and all other charges pursuant to the Lease.

    | Period | Monthly Amount |
    | --- | --- |
    | March 1, 2010 – February 28, 2011 | $16,843.20 |
    | March 1, 2011 – February 29, 2012 | $17,966.08 |
    | March 1, 2012 – February 28, 2013 | $18,527.52 |
    | March 1, 2013 – February 28, 2014 | $19,088.96 |
    | March 1, 2014 – February 28, 2015 | $19,650.40 |

3.  In all other respects, except as specifically and expressly amended, modified or supplemented as provided for in this Third Amendment, all other terms of the Lease shall remain in full force and effect. Any further modification of the Lease shall require the express written approval of all parties.

4.  Delivery of this Third Amendment to Tenant shall not be deemed to be an offer to lease and shall not be binding on either party until executed and delivered by both parties.

Signatures on following page

THIRD AMENDMENT TO LEASE AGREEMENT
February 12, 2010
Page 2

IN WITNESS WHEREOF, the parties hereto have signed and sealed this Third Amendment on the date previously written.

TENANT:

Premiere Hardwoods, LLC,
an Arizona limited liability company

By:
    David Weston
    Member

LANDLORD:

EASTGROUP PROPERTIES, L.P.,
a Delaware limited partnership
By: EastGroup Properties General Partners, Inc.,
a Delaware Corporation

By:
    William D. Petsas
    Senior Vice President

By:
    Michael P. Sacco, III
    Vice President

## FIFTH AMENDMENT TO LEASE AGREEMENT

This FIFTH AMENDMENT TO LEASE AGREEMENT ("Fifth Amendment") is entered into as of May 3⟩ , 2011, by and between EastGroup Properties L.P., a Delaware limited partnership, herein referred to as "Landlord" and Premiere Hardwoods, LLC, an Arizona limited liability company, herein referred to as "Tenant".

### RECITALS

A.      Landlord and Tenant had previously entered into a Lease Agreement (which together with any amendments, modifications, renewals and extensions thereof is hereinafter referred to as the "Lease") which was dated April 5, 2002, by which Landlord leased to Tenant approximately 56,144 rentable square feet at 616 South 55th Avenue, Suite 101, Phoenix, Arizona 85043 (herein referred to as "Premises"). Such terms of the Lease continue in full force and effect and the Lease is incorporated herein by reference.

B.      Landlord and Tenant desire to amend the terms of the Lease upon and subject to the terms and conditions set forth in this Fifth Amendment.

NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, THE RECEIPT OF WHICH IS HEREBY ACKNOWLEDGED, and in consideration of the Premises and the mutual covenants contained herein, and intending to be legally bound, Landlord and Tenant hereby agree as follows:

1.      The Term of the Lease is hereby amended by the addition of 12 months such that the Lease shall expire February 28, 2016.

2.      Base Rent payable monthly for the period of June 1, 2011 through February 28, 2016 shall be in accordance with the schedule below. In addition to Base Rent, Tenant shall pay to Landlord all Operating Expenses and all other charges pursuant to the Lease.

| Period | Monthly Base Rent |
|---|---|
| June 1, 2011 – September 30, 2011 | $8,421.60 |
| October 1, 2011 – February 28, 2013 | $16,843.20 |
| March 1, 2013 – February 28, 2015 | $17,404.64 |
| March 1, 2015 – February 28, 2016 | $17,966.08 |

3.      In all other respects, except as specifically and expressly amended, modified or supplemented as provided for in this Fifth Amendment, all other terms of the Lease shall remain in full force and effect. Any further modification of the Lease shall require the express written approval of all parties.

4.      Delivery of this Fifth Amendment to Tenant shall not be deemed to be an offer to lease and shall not be binding on either party until executed and delivered by both parties.

IN WITNESS WHEREOF, the parties hereto have signed and sealed this Fifth Amendment on the date previously written.

TENANT:                                         LANDLORD:

PREMIERE HARDWOODS, LLC,                         EASTGROUP PROPERTIES, L.P.,
an Arizona limited liability company             a Delaware limited partnership
                                                 By: EastGroup Properties General Partners, Inc.,
                                                 a Delaware corporation, its general partner

By: _____              By: _____
        David Weston                                 William D. Petsas
        Member                                       Senior Vice President

                                         By: _____
                                                 Michael P. Sacco, III
                                                 Vice President

## SIXTH AMENDMENT TO LEASE AGREEMENT

This SIXTH AMENDMENT TO LEASE AGREEMENT ("Sixth Amendment") is entered into as of April **23**, 2013, by and between EastGroup Properties L.P., a Delaware limited partnership, herein referred to as "Landlord" and Premiere Hardwoods, LLC, an Arizona limited liability company, herein referred to as "Tenant".

### RECITALS

A.     Landlord and Tenant had previously entered into a Lease Agreement (which together with any amendments, modifications, renewals and extensions thereof is hereinafter referred to as the "Lease") which was dated April 5, 2002, by which Landlord leased to Tenant approximately 56,144 rentable square feet at 616 South 55th Avenue, Suite 101, Phoenix, Arizona 85043 (herein referred to as "Premises"). Such terms of the Lease continue in full force and effect and the Lease is incorporated herein by reference.

B.     Landlord and Tenant desire to amend the terms of the Lease upon and subject to the terms and conditions set forth in this Sixth Amendment.

NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, THE RECEIPT OF WHICH IS HEREBY ACKNOWLEDGED, and in consideration of the Premises and the mutual covenants contained herein, and intending to be legally bound, Landlord and Tenant hereby agree as follows:

1. Provided that no Event of Default shall then exist, or would exist but for the passage of time, the giving of notice, or both, then Tenant's Security Deposit, in the amount of $30,395.00, shall be reduced by $20,395.00, with the reduction being credited towards Tenant's Base Rent due under the Lease, in eight equal monthly installments of $2,549.37 per month, during the period of May 1, 2013 through December 31, 2013, reducing Tenant's Security Deposit to $10,000.00 from and after January 1, 2014.

2. Base Rent payable monthly for the period of January 1, 2014 through February 28, 2016 shall be as set forth below. In addition to Base Rent, Tenant shall pay to Landlord all Operating Expenses and all other charges pursuant to the Lease.

| Period | Monthly Amount |
|---|---|
| January 1, 2014 – December 31, 2014 | $16,904.64 |
| January 1, 2015 – February 28, 2015 | $17,404.64 |
| March 1, 2015 – February 29, 2016 | $17,966.08 |

3. In all other respects, except as specifically and expressly amended, modified or supplemented as provided for in this Sixth Amendment, all other terms of the Lease shall remain in full force and effect. Any further modification of the Lease shall require the express written approval of all parties.

4. Delivery of this Sixth Amendment to Tenant shall not be deemed to be an offer to lease and shall not be binding on either party until executed and delivered by both parties.

Signatures on following page

Page 1 of 2

Initials

IN WITNESS WHEREOF, the parties hereto have signed and sealed this Sixth Amendment on the date previously written.

TENANT:

PREMIERE HARDWOODS, LLC,
an Arizona limited liability company

By: _____
David Weston
Member

LANDLORD:

EASTGROUP PROPERTIES, L.P.,
a Delaware limited partnership
By: EastGroup Properties General Partners, inc.,
a Delaware corporation, its general partner

By: _____
William D. Petsas
Senior Vice President

By: _____
Michael P. Sacco, III
Vice President

Page 2 of 2

## SEVENTH AMENDMENT TO LEASE AGREEMENT

This SEVENTH AMENDMENT TO LEASE AGREEMENT ("Seventh Amendment") is entered into as of April *MAY* 12, 2014, by and between EastGroup Properties L.P., a Delaware limited partnership, herein referred to as "Landlord" and Premiere Hardwoods, LLC, an Arizona limited liability company, herein referred to as "Tenant".

### RECITALS

A.      Landlord and Tenant had previously entered into a Lease Agreement (which together with any amendments, modifications, renewals and extensions thereof is hereinafter referred to as the "Lease") which was dated April 5, 2002, by which Landlord leased to Tenant approximately 56,144 rentable square feet at 616 South 55th Avenue, Suite 101, Phoenix, Arizona 85043 (herein referred to as "Premises"). Such terms of the Lease continue in full force and effect and the Lease is incorporated herein by reference.

B.      Landlord and Tenant desire to amend the terms of the Lease upon and subject to the terms and conditions set forth in this Seventh Amendment.

NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, THE RECEIPT OF WHICH IS HEREBY ACKNOWLEDGED, and in consideration of the Premises and the mutual covenants contained herein, and intending to be legally bound, Landlord and Tenant hereby agree as follows:

1.  Effective June 1, 2014, the Premises shall be changed from the 56,144 rentable square feet generally known as 616 South 55th Avenue, Suite 101, Phoenix, Arizona ("55th Avenue") to the 32,448 rentable square feet generally known as 5609 West Latham Street, Suite 105, Phoenix, Arizona ("Interstate"), as depicted on the attached Exhibit A.

2.  Effective June 1, 2014, Tenant's Proportionate Share of the Building shall be changed to 61.69% and Tenant's Proportionate Share of the Project shall be changed to 23.85%.

3.  Tenant will have the period of May 1, 2014 through May 31, 2014 to relocate from 55th Avenue to Interstate with rental obligations ceasing at 55th Avenue effective May 31, 2014 and commencing at Interstate effective June 1, 2014 in accordance with Paragraph 6 below.

4.  Tenant shall surrender 55th Avenue to Landlord on or prior to May 31, 2014 in accordance with Paragraph 25 of the Lease, titled "Alterations and Trade Fixtures" and Paragraph 26 of the Lease, titled "Surrender of Premises".

5.  The Term of the Lease is hereby amended by the addition of 42 months such that the Lease shall expire August 31, 2019.

6.  Base Rent payable monthly for the period of June 1, 2014 through August 31, 2019 shall be in accordance with the schedule below. In addition to Base Rent, Tenant shall pay to Landlord all Operating Expenses and all other charges pursuant to the Lease.

| Period | Monthly Amount |
|---|---|
| June 1, 2014 – June 30, 2014 | $0.00 |
| July 1, 2014 – November 30, 2014 | $4,867.20 |
| December 1, 2014 – November 30, 2015 | $9,734.40 |
| December 1, 2015 – November 30, 2016 | $10,058.88 |
| December 1, 2016 – November 30, 2017 | $10,383.36 |
| December 1, 2017 – November 30, 2018 | $10,707.84 |
| December 1, 2018 – August 31, 2019 | $11,032.32 |

7.  On May 1, 2014, Landlord shall deliver Interstate broom clean and free of debris with the HVAC, evaporative cooling, loading doors, lighting and building systems in good operating condition. Following full execution of this Seventh Amendment by Landlord and Tenant, Landlord shall work diligently to complete construction drawings, obtain a permit and make the following improvements ("Improvements"), in accordance with building standards, as

listed below and further depicted on the attached Exhibit B:

- Enlarge one existing grade level door to approximately 16' tall by 17' wide
- Construct a new private office within the existing office area immediately to the west of the existing conference room with approximate dimensions of 12' by 13'
- Install a new 4' by 4' timely framed window in the south perimeter office wall centered between the new private office and the man door leading out to the warehouse
- Install two edge-of-dock levelers on the two easternmost dock doors of the Premises.
- Install a new warehouse restroom with a sink, toilet and urinal.

Tenant hereby acknowledges that the preparation of construction drawings, city permitting and construction of the Improvements will take approximately two months from the date this Seventh Amendment is fully executed by Landlord and Tenant. Landlord's contractor will work with Tenant to minimize the interruption to Tenant's business, however, construction will occur while Tenant is occupying Interstate. Furthermore, Tenant acknowledges that Landlord will commence work at the 55th Avenue location during Tenant's relocation period and Tenant agrees to cooperate with Landlord and its contractors during that time.

8.  In all other respects, except as specifically and expressly amended, modified or supplemented as provided for in this Seventh Amendment, all other terms of the Lease shall remain in full force and effect. Any further modification of the Lease shall require the express written approval of all parties.

9.  Delivery of this Seventh Amendment to Tenant shall not be deemed to be an offer to lease and shall not be binding on either party until executed and delivered by both parties.

IN WITNESS WHEREOF, the parties hereto have signed and sealed this Seventh Amendment on the date previously written.

TENANT

PREMIERE HARDWOODS, LLC,
an Arizona limited liability company

By:     _____
        David Weston
        Member

LANDLORD:

EASTGROUP PROPERTIES, L.P.,
a Delaware limited partnership
By: EastGroup Properties General Partners, Inc.,
a Delaware corporation, its general partner

By:     _____
        William D. Petsas
        Senior Vice President

By:     _____
        Michael P. Sacco, III
        Vice President

## EXHIBIT A
## PREMISES

The Premises contain 32,448 rentable square feet and is known by the following street address 5609 West Latham Street, Suite 105, Phoenix, Arizona 85043.



## EXHIBIT B
## IMPROVEMENTS



# EIGHTH AMENDMENT TO LEASE AGREEMENT

This EIGHTH AMENDMENT TO LEASE AGREEMENT ("Eighth Amendment") is entered into as of July 8, 2014, by and between EastGroup Properties L.P., a Delaware limited partnership, herein referred to as "Landlord" and Premiere Hardwoods, LLC, an Arizona limited liability company, herein referred to as "Tenant".

## RECITALS

A.      Landlord and Tenant had previously entered into a Lease Agreement (which together with any amendments, modifications, renewals and extensions thereof is hereinafter referred to as the "Lease") which was dated April 5, 2002, by which Landlord leased to Tenant approximately 56,144 rentable square feet at 616 South 55th Avenue, Suite 101, Phoenix, Arizona, which under the Seventh Amendment was changed to the 32,448 rentable square feet at 5609 West Latham Street, Suite 105, Phoenix, Arizona (herein referred to as "Premises"). Such terms of the Lease continue in full force and effect and the Lease is incorporated herein by reference.

B.      Landlord and Tenant desire to amend the terms of the Lease upon and subject to the terms and conditions set forth in this Eighth Amendment.

NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, THE RECEIPT OF WHICH IS HEREBY ACKNOWLEDGED, and in consideration of the Premises and the mutual covenants contained herein, and intending to be legally bound, Landlord and Tenant hereby agree as follows:

1.  The Term of the Lease is hereby amended by the addition of 1 month such that the Lease shall expire September 30, 2019.

2.  Base Rent payable monthly for the period of June 1, 2014 through September 30, 2019 shall be in accordance with the schedule below. In addition to Base Rent, Tenant shall pay to Landlord all Operating Expenses and all other charges pursuant to the Lease.

| Period | Monthly Base Rent |
|---|---|
| June 1, 2014 – July 31, 2014 | $0.00 |
| August 1, 2014 – December 31, 2014 | $4,867.20 |
| January 1, 2015 – December 31, 2015 | $9,734.40 |
| January 1, 2016 – December 31, 2016 | $10,058.88 |
| January 1, 2017 – December 31, 2017 | $10,383.36 |
| January 1, 2018 – December 31, 2018 | $10,707.84 |
| January 1, 2019 – September 30, 2019 | $11,032.32 |

3.  In all other respects, except as specifically and expressly amended, modified or supplemented as provided for in this Eighth Amendment, all other terms of the Lease shall remain in full force and effect. Any further modification of the Lease shall require the express written approval of all parties.

4.  Delivery of this Eighth Amendment to Tenant shall not be deemed to be an offer to lease and shall not be binding on either party until executed and delivered by both parties.

Signatures on following page

Page 1 of 2

Initials

EIGHTH AMENDMENT TO LEASE AGREEMENT
JULY 8, 2014

IN WITNESS WHEREOF, the parties hereto have signed and sealed this Eighth Amendment on the date previously written.

TENANT:

PREMIERE HARDWOODS, LLC,
an Arizona limited liability company

By:

David Weston
Member

LANDLORD:

EASTGROUP PROPERTIES, L.P.,
a Delaware limited partnership
By: EastGroup Properties General Partners, Inc.,
a Delaware corporation, its general partner

By:

William D. Petsas
Senior Vice President

By:

Michael P. Sacco, III
Vice President

Page 2 of 2

# NINTH AMENDMENT TO LEASE AGREEMENT

This NINTH AMENDMENT TO LEASE AGREEMENT ("Ninth Amendment") is entered into as of June ___, 2015, by and between EastGroup Properties L.P., a Delaware limited partnership, herein referred to as "Landlord" and Superior Hardwoods Investment Group, LLC, an Arizona limited liability company, successor in interest to Premiere Hardwoods, LLC, an Arizona limited liability company, herein referred to as "Tenant".

## RECITALS

A.  Landlord and Tenant had previously entered into a Lease Agreement (which together with any amendments, modifications, renewals and extensions thereof is hereinafter referred to as the "Lease") which was dated April 5, 2002, by which Landlord leased to Tenant approximately 56,144 rentable square feet at 616 South 55th Avenue, Suite101, Phoenix, Arizona 85043, which under the Seventh Amendment dated May 12, 2014 was changed to the 32,448 rentable square feet at 5609 West Latham Street, Suite 105, Phoenix, Arizona 85043 (herein referred to as "Premises"). Such terms of the Lease continue in full force and effect and the Lease is incorporated herein by reference.

B.  Landlord and Tenant desire to amend the terms of the Lease upon and subject to the terms and conditions set forth in this Ninth Amendment.

NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, THE RECEIPT OF WHICH IS HEREBY ACKNOWLEDGED, and in consideration of the Premises and the mutual covenants contained herein, and intending to be legally bound, Landlord and Tenant hereby agree as follows:

1.  The Term of the Lease is hereby amended by the addition of 3 months such that the Lease shall expire December 31, 2019.

2.  Base Rent payable monthly for the period of July 1, 2015 through December 31, 2019 shall be in accordance with the schedule below. In addition to Base Rent, Tenant shall pay to Landlord all Operating Expenses and all other charges pursuant to the Lease.

| Period | Monthly Base Rent |
|---|---|
| July 1, 2015 – September 30, 2015 | $4,867.20 |
| October 1, 2015 – March 31, 2016 | $9,734.40 |
| April 1, 2016 – March 31, 2017 | $10,058.88 |
| April 1, 2017 – March 31, 2018 | $10,383.36 |
| April 1, 2018 – March 31, 2019 | $10,707.84 |
| April 1, 2019 – December 31, 2019 | $11,032.32 |

3.  In all other respects, except as specifically and expressly amended, modified or supplemented as provided for in this Ninth Amendment, all other terms of the Lease shall remain in full force and effect. Any further modification of the Lease shall require the express written approval of all parties.

4.  Delivery of this Ninth Amendment to Tenant shall not be deemed to be an offer to lease and shall not be binding on either party until executed and delivered by both parties.

Page 1 of 2

Initials

**NINTH AMENDMENT TO LEASE AGREEMENT**
**JUNE ___, 2015**

IN WITNESS WHEREOF, the parties hereto have signed and sealed this Ninth Amendment on the date previously written.

TENANT:

SUPERIOR HARDWOODS INVESTMENT GROUP, LLC
an Arizona limited liability company

By: _____
      Donald Hansen
      Managing Member

LANDLORD:

EASTGROUP PROPERTIES, L.P.,
a Delaware limited partnership
By: EastGroup Properties General Partners, Inc.,
a Delaware corporation, its general partner

By: _____
      William D. Petsas
      Senior Vice President

By: _____
      Michael P. Sacco, III
      Vice President

EXHIBIT "2"



## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

```
ARIZONA BUSINESS BANK
ATTN: LOAN OPERATIONS
P.O. BOX 8779
DENVER, CO 80201
```

SECRETARY OF STATE

2011 FEB 28 PM 12: 05

FILED

201116431021

02/28/2011  1:14PM 002952 #9836
3347 MARTHA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

$5.00
$45.00

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Premiere Hardwoods, L.L.C. | | | |

| OR | 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 616 S. 55th Ave. #101 | Phoenix | AZ | 85043 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | LLC | AZ | ☒ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

| OR | 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| ARIZONA BUSINESS BANK | | | |

| OR | 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 6909 E. GREENWAY PKWY. STE. 150 | SCOTTSDALE | AZ | 85254 | USA |

4. This FINANCING STATEMENT covers the following collateral:

All Inventory, Chattel Paper, Accounts, Equipment, General Intangibles and Fixtures located at: 616 S. 55th Ave. #101, Phoenix AZ 85043; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds).

| 5. ALTERNATIVE DESIGNATION (if applicable): | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☒ This FINANCING STATEMENT is to be filed [for record] [or recorded] in the REAL ESTATE RECORDS.  Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]   [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

Harland Financial Solutions
400 S.W. 6th Avenue, Portland, Oregon 97204

Arizona Secretary of State - Uncertified Copy

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT**

9a. ORGANIZATION'S NAME

Premiere Hardwoods, L.L.C.

OR

| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |
|---|---|---|

**10. MISCELLANEOUS:**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one name (11a or 11b) - do not abbreviate or combine names

11a. ORGANIZATION'S NAME

OR

| 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 11d. SEE INSTRUCTIONS | ADDL INFO RE ORGANIZATION DEBTOR | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any | NONE |
|---|---|---|---|---|---|

**12.** ☐ ADDITIONAL SECURED PARTY'S or ☐ ASSIGNOR S/P'S NAME - insert only one name (12a or 12b)

12a. ORGANIZATION'S NAME

OR

| 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**13.** This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☒ fixture filing.

**14.** Description of real estate.

**16.** Additional collateral description:

**15.** Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):

**17.** Check only if applicable and check only one box.

Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

**18.** Check only if applicable and check only one box.

☐ Debtor is a TRANSMITTING UTILITY

☐ Filed in connection with a Manufactured-Home Transaction

☐ Filed in connection with a Public-Finance Transaction

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (FORM UCC1Ad) (REV. 05/21/09)

Harland Financial Solutions
400 S.W. 6th Avenue, Portland, Oregon 97204

Arizona uncertified Copy of Secretary of State

**EXHIBIT "3"**

In re    Premiere Hardwoods, LLC                                          Case No. _____

                                              Debtor

## SCHEDULE B - PERSONAL PROPERTY

Except as directed below, list all personal property of the debtor of whatever kind. If the debtor has no property in one or more of the categories, place an "x" in the appropriate position in the column labeled "None." If additional space is needed in any category, attach a separate sheet properly identified with the case name, case number, and the number of the category. If the debtor is married, state whether husband, wife, both, or the marital community own the property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor is an individual or a joint petition is filed, state the amount of any exemptions claimed only in Schedule C - Property Claimed as Exempt.

**Do not list interests in executory contracts and unexpired leases on this schedule. List them in Schedule G - Executory Contracts and Unexpired Leases.**

If the property is being held for the debtor by someone else, state that person's name and address under "Description and Location of Property." If the property is being held for a minor child, simply state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m).

| Type of Property | N O N E | Description and Location of Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 1. Cash on hand | X | | | |
| 2. Checking, savings or other financial accounts, certificates of deposit, or shares in banks, savings and loan, thrift, building and loan, and homestead associations, or credit unions, brokerage houses, or cooperatives. | | Business Checking Account ending in 7621 | - | 500.00 |
| | | Business Checking Account ending in 3700 | - | 200.00 |
| 3. Security deposits with public utilities, telephone companies, landlords, and others. | | Eastgroup Properties - security deposit Lease | - | 10,000.00 |
| 4. Household goods and furnishings, including audio, video, and computer equipment. | X | | | |
| 5. Books, pictures and other art objects, antiques, stamp, coin, record, tape, compact disc, and other collections or collectibles. | X | | | |
| 6. Wearing apparel. | X | | | |
| 7. Furs and jewelry. | X | | | |
| 8. Firearms and sports, photographic, and other hobby equipment. | X | | | |
| 9. Interests in insurance policies. Name insurance company of each policy and itemize surrender or refund value of each. | X | | | |
| 10. Annuities. Itemize and name each issuer. | X | | | |

                                                              Sub-Total >          10,700.00
                                                           (Total of this page)

__5__ continuation sheets attached to the Schedule of Personal Property

In re    Premiere Hardwoods, LLC                                           Case No. _____

_____
                        Debtor

## SCHEDULE B - PERSONAL PROPERTY
(Continuation Sheet)

| Type of Property | N O N E | Description and Location of Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 11. Interests in an education IRA as defined in 26 U.S.C. § 530(b)(1) or under a qualified State tuition plan as defined in 26 U.S.C. § 529(b)(1). Give particulars. (File separately the record(s) of any such interest(s). 11 U.S.C. § 521(c).) | X | | | |
| 12. Interests in IRA, ERISA, Keogh, or other pension or profit sharing plans. Give particulars. | X | | | |
| 13. Stock and interests in incorporated and unincorporated businesses. Itemize. | X | | | |
| 14. Interests in partnerships or joint ventures. Itemize. | X | | | |
| 15. Government and corporate bonds and other negotiable and nonnegotiable instruments. | X | | | |
| 16. Accounts receivable. | | Accounts receivable | - | 187,000.00 |
| 17. Alimony, maintenance, support, and property settlements to which the debtor is or may be entitled. Give particulars. | X | | | |
| 18. Other liquidated debts owed to debtor including tax refunds. Give particulars. | X | | | |
| 19. Equitable or future interests, life estates, and rights or powers exercisable for the benefit of the debtor other than those listed in Schedule A - Real Property. | X | | | |
| 20. Contingent and noncontingent interests in estate of a decedent, death benefit plan, life insurance policy, or trust. | X | | | |
| 21. Other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims. Give estimated value of each. | X | | | |

                                                                            Sub-Total >          187,000.00
                                                                        (Total of this page)

Sheet __1__ of __5__ continuation sheets attached
to the Schedule of Personal Property

In re  Premiere Hardwoods, LLC                                      Case No. _____

_____
                    Debtor

## SCHEDULE B - PERSONAL PROPERTY
(Continuation Sheet)

| Type of Property | N O N E | Description and Location of Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 22. Patents, copyrights, and other intellectual property. Give particulars. | X | | | |
| 23. Licenses, franchises, and other general intangibles. Give particulars. | X | | | |
| 24. Customer lists or other compilations containing personally identifiable information (as defined in 11 U.S.C. § 101(41A)) provided to the debtor by individuals in connection with obtaining a product or service from the debtor primarily for personal, family, or household purposes. | X | | | |
| 25. Automobiles, trucks, trailers, and other vehicles and accessories. | | 2011 Hyundai Sonata 180,000 miles | - | 9,000.00 |
| | | 2004 Ford F150 pickup 120,000 miles | - | 5,000.00 |
| | | Trailer | - | 4,500.00 |
| | | Curtain Van | - | 15,000.00 |
| 26. Boats, motors, and accessories. | X | | | |
| 27. Aircraft and accessories. | X | | | |
| 28. Office equipment, furnishings, and supplies. | | Desk and Credenzas | - | 7,500.00 |
| | | file cabinets | - | 2,500.00 |
| | | 4 sled chairs | - | 500.00 |
| | | Computers and printers | - | 300.00 |
| | | telephones | - | 100.00 |
| | | Office Equipment | - | 750.00 |
| | | HP Deskjet 400 | - | 100.00 |
| | | HP Deskjet 712C | - | 100.00 |
| | | Okidata Microline 320 | - | 200.00 |
| 29. Machinery, fixtures, equipment, and supplies used in business. | | 3 Phase A/C Compressor | - | 2,498.00 |

                                                          Sub-Total >          48,048.00
                                                     (Total of this page)

Sheet  2  of  5  continuation sheets attached
to the Schedule of Personal Property

In re    Premiere Hardwoods, LLC

Case No. _____

Debtor

## SCHEDULE B - PERSONAL PROPERTY
(Continuation Sheet)

| Type of Property | N O N E | Description and Location of Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| | | Laminator & Equipment | - | 40,000.00 |
| | | Compressor & Lift Tables | - | 7,700.00 |
| | | Racks, Work Stat, Carts | - | 37,500.00 |
| | | 4 forklifts | - | 20,000.00 |
| | | Miscellaneous Supplies | - | 5,000.00 |
| | | 2 Shop Carts | - | 896.00 |
| | | Warehouse racks | - | 2,986.00 |
| | | Warehouse Racks | - | 4,720.00 |
| | | Laminate Racks | - | 1,760.00 |
| | | Rack | - | 343.00 |
| | | Edgebander | - | 6,000.00 |
| | | Grinder | - | 3,000.00 |
| | | Southworth Lift Table | - | 1,000.00 |
| | | OR-T 50 Battery Combo | - | 1,550.00 |
| | | Yale 5000 lb Forklift | - | 5,000.00 |
| | | Hyster 5000 lb Forklift | - | 5,000.00 |
| | | 1995 Schelling Panel Saw | - | 20,000.00 |
| | | 1999 Andi Stratob Router | - | 15,000.00 |
| | | 1994 Watkins 5 Hd Moulder | - | 20,000.00 |
| | | 1997 Lobo Knife Grinder | - | 400.00 |
| | | CTD dbl Miter Saw | - | 1,500.00 |
| | | 2004 Screw Air Compressor | - | 2,000.00 |
| | | Kaeser Air Dryer | - | 500.00 |
| | | Cyclone Dust Collector 25 | - | 3,000.00 |

Sub-Total >
(Total of this page)

204,855.00

Sheet  3  of  5  continuation sheets attached
to the Schedule of Personal Property

In re  Premiere Hardwoods, LLC _____,  Case No. _____

Debtor

# SCHEDULE B - PERSONAL PROPERTY
(Continuation Sheet)

| Type of Property | N O N E | Description and Location of Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| | | Jet Dust Collector | - | 200.00 |
| | | Delta 10" Unisaw | - | 300.00 |
| | | Ridgid 10" Chop Saw | - | 50.00 |
| | | Ryobi 10" Chop Saw | - | 50.00 |
| | | Ryobi 16" Scroll Saw | - | 50.00 |
| | | Delta 8 1/4 Miter Saw | - | 50.00 |
| | | Delta Bench Grinder #840 | - | 50.00 |
| | | Delta Bench Grinder #6 | - | 50.00 |
| | | Carlson Roller Index Tbl | - | 100.00 |
| | | Jesco Tilt Dumpster | - | 200.00 |
| | | Steel Bander Cart (2) | - | 100.00 |
| | | 3 Lift Tables | - | 600.00 |
| | | 2 pallet Racks | - | 200.00 |
| | | 3 Cantilever Racks | - | 600.00 |
| | | SK 224 Surface Planer | - | 20,000.00 |
| | | Belair Dryer #ACT1000-1 | - | 2,000.00 |
| | | Dipchain Gang Ripsaw | - | 20,000.00 |
| | | Dust Collector | - | 3,115.00 |
| | | Spindle Assembly 40MM | - | 3,226.00 |
| | | Pinch Roller | - | 1,725.00 |
| | | Aggregate Head - Anderson | - | 5,610.00 |
| | | Dust Collecto 10hp | - | 2,500.00 |
| 30. Inventory. | | Inventory | - | 205,000.00 |
| 31. Animals. | X | | | |

Sub-Total > 265,776.00
(Total of this page)

Sheet  4  of  5  continuation sheets attached
to the Schedule of Personal Property

Software Copyright (c) 1996-2014 - Best Case, LLC - www.bestcase.com

Best Case Bankruptcy

In re    Premiere Hardwoods, LLC                                    Case No. _____

_____
                        Debtor

## SCHEDULE B - PERSONAL PROPERTY
(Continuation Sheet)

| Type of Property | N O N E | Description and Location of Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 32. Crops - growing or harvested. Give particulars. | X | | | |
| 33. Farming equipment and implements. | X | | | |
| 34. Farm supplies, chemicals, and feed. | X | | | |
| 35. Other personal property of any kind not already listed. Itemize. | X | | | |

|  |  |
|---|---|
| Sub-Total > (Total of this page) | 0.00 |
| Total > | 716,379.00 |

Sheet __5__ of __5__ continuation sheets attached
to the Schedule of Personal Property

(Report also on Summary of Schedules)

Software Copyright (c) 1996-2014 - Best Case, LLC - www.bestcase.com
Desc
Best Case Bankruptcy

**EXHIBIT "4"**

## ASSIGNMENT OF LEASE

THIS ASSIGNMENT OF LEASE is entered into on this ___ day of June, 2015, by and between Superior Hardwoods Investment Group, LLC, an Arizona limited liability company (the "Assignee"), and Premiere Hardwoods, LLC, an Arizona limited liability company (the "Assignor").

WHEREAS, Assignor presently holds lease rights on property at 5609 West Latham Street, Suite 105, Phoenix, Arizona 85043 ("Premises"), more fully described in that certain Lease dated April 5, 2002, and;

WHEREAS, Assignor desires to assign to Assignee and Assignee desires to assume all of Assignor's interest in and to the Lease Agreement;

NOW, THEREFORE, Assignor does hereby set over unto and assigns to Assignee all of Assignor's right, title and interest in the Property and the Lease Agreement for the unexpired term of the Lease Agreement and any extensions or renewals thereof.

Effective as of June ___, 2015 the Assignee hereby accepts the foregoing assignment and covenants to pay rent directly to Landlord under the Lease Agreement when due and perform all covenants, conditions and stipulations required of the Tenant to be performed or undertaken pursuant to the Lease Agreement.

IN WITNESS WHEREOF, the parties hereto have set their hands by their authorized agents.

**ASSIGNEE**                                    **ASSIGNOR**


By: _____          By: _____

    Donald Hansen                                    David Weston
    Managing Member                              Member

**EXHIBIT "5"**

# ASSET PURCHASE AGREEMENT

This Agreement, made and entered into _____, 2015, by and between PREMIERE HARDWOODS, LLC ("Seller"), and SUPREME HARDWOODS OF ARIZONA, LLC, an Arizona Limited Liability Company, ("Buyer").

## WITNESSETH:

WHEREAS, Buyer desires to buy and Seller desires to sell to Buyer the assets of the business operated by Seller under the name PREMIERE HARDWOODS, LLC for the purchase price and upon the terms and conditions hereinafter set forth.

NOW THEREFORE, in consideration of the foregoing premises and the mutual covenants hereinafter stated, the parties agree as follows:

1.      DESCRIPTION: The Seller shall sell, assign and transfer to the Buyer, Seller's entire interest in the assets of that certain business operating 5609 W. Latham Street, Suite 105, Phoenix, Arizona 85043, including, but not limited to the following:

a.      All personal property as set forth in that certain First Position UCC1, in favor of Arizona business Bank ("Bank") as evidenced by a recorded UCC1 attached hereto as **Exhibit "1"**.

b.      All personal property scheduled by the Debtor, Premiere Hardwoods, LLC (Case No. 2:15-bk-01182 BMW, U.S. Bankruptcy Court, District of Arizona) in Schedule B filed in those proceedings and attached hereto as **Exhibit "2"**.

2.      PURCHASE PRICE:

a.      The purchase price for the Assets shall be $270,000.00 (Two Hundred Seventy Thousand U.S. Dollars).

b.      This price is valid through May 30, 2015 and may be extended by the parties hereto and the Bank in writing.

c.      The terms and conditions of this Agreement must be approved by the United States Bankruptcy Court. In the event this Agreement is not approved by the United States Bankruptcy Court, this Agreement shall be deemed void.

d.      Payment of final purchase price shall be made via Certified Funds upon closing. Closing to occur on or before May 30, 2014, unless extended by the parties hereto and the Bank in writing.

3.    ADDITIONAL TERMS:

a.    Employees.  Buyer is not assuming any liability Seller may have relating to any contract, including any employment contract.  Buyer may elect following Close to hire employees formerly employed by Seller, but is not obligated to do so.  Premiere Hardwoods, LLC is responsible for all obligations owed to Seller's employees prior to date of Close.

4.    CLOSING DATE: The Closing shall take place on May 30, 2015, unless extended pursuant to Paragraph 2 above.

5.    INSTRUMENT OF CONVEYANCE.  Upon Close of the transaction, Seller shall sign and deliver to Buyer a Bill of Sale.

6.    SELLER'S COVENANTS, REPRESENTATIONS AND WARRANTIES: Seller hereby represents and warrants to Buyer as follows:

a.    Seller is a corporation duly organized and existing in good standing under the laws of the State of Arizona.

b.    Seller is the sole owner and has good and marketable title to the Assets, free and clear of all liens and encumbrances, except for the lien to ARIZONA BUSINESS BANK.

c.    All books and records made available to Buyer in connection with Buyer's due diligence are true and correct copies of Seller's books and records, and Seller is not aware of any material misrepresentation or omission in any such book or record.

7.    BUYER'S COVENANTS, REPRESENTATIONS AND WARRANTIES:  Buyer hereby represents and warrants to Seller as follows:

a.    Buyer is a limited liability company duly organized and existing and in good standing under the laws of the State of Arizona.

b.    Buyer has all requisite power and authority to enter into and perform the terms of this Agreement.  The signing, delivery and consummation of this Agreement to Buyer and the transactions contemplated herein have been duly authorized by all necessary corporate action.

c.    This Agreement and all supporting documentation constitute valid and legally binding obligations of Buyer, enforceable in accordance with their terms, except as enforcement may be limited by bankruptcy, insolvency or similar laws affecting creditor's rights generally.

d.     The execution, delivery and performance of this Agreement by Buyer does not require the consent of any third party and neither conflicts with, results in breach of, or constitutes a default under any applicable law, judgment, order, injunction, decree, rules, regulation or ruling or any court or government instrumentality, nor does it conflict with, constitute grounds for termination of or constitute a default under any agreement, license or permit to which Buyer is now subject.

e.     There is no broker, finder or other person who has any valid claim against the Seller for commission, finder's fee or brokerage fee in connection with this Agreement or the transactions contemplated hereby as a result of any actions taken by Buyer.

8.     SURVIVAL OF WARRANTIES: Seller and Buyer represent to each other that all of the representations, warranties, covenants and terms contained in this Agreement made by one to the other, and in any documents, certificates or other instruments delivered by or on behalf of Seller and Buyer pursuant hereto or in connection with the transactions contemplated herein are true now and will be true at the Closing and will survive the Closing. No investigation by or on behalf of any party shall constitute a waiver as to enforcement of any representation or warranty contained herein, or a waiver as to any indemnification to which a party may be entitled under this Agreement.

9.     CLOSING CONTINGENCIES: The obligations of Buyer hereunder are expressly made contingent upon the conditions that, on the Closing Date:

a.     The representations and warranties of Seller shall be true and correct in all material respects.

b.     Seller shall in all material respects have met all conditions and performed all obligations to be met or performed by Seller hereunder.

10.     MODIFICATION OR WAIVER: No modification of this Agreement shall be deemed effective unless in writing and signed by the parties hereto, and waiver granted shall not be deemed effective unless in writing, signed by the party against whom enforcement of the waiver is sought.

11.     THIRD PARTY BENEFICIARIES: Nothing in this Agreement, express or implied, is intended to confer any rights or remedies under or by reason of the Agreement on any persons other than the parties to it, nor is anything in the Agreement intended to relieve or discharge the obligation or liability of any third person to any party to this Agreement.

12.     AMENDMENT: This Agreement shall be amended only by a written Agreement signed by all the parties hereto.

13.     VENUE The proper venue for any proceeding at law or in equity or under the provisions for arbitration shall be in Maricopa County, Arizona, and the parties hereto do hereby waive any right to object to the venue.

14. ATTORNEYS' FEES If any arbitration proceeding or action shall be brought to recover any amount under this Agreement, or on account of any breach or, to enforce or interpret any of the terms, covenants or conditions of this Agreement, the prevailing party shall be entitled to recover from the other party, as part of the prevailing party's costs, reasonable attorneys' fees, the amount of which shall be fixed by the arbitrators or by the court, and shall be made part of any award or judgment rendered.

15. EFFECT OR AGREEMENT: Except as provided herein, this Agreement and the exhibits and schedules hereto embody the entire Agreement and understanding of the parties and supersede any and all prior agreements, arrangements and understanding relating to matters provided for herein. No amendment, waiver or compliance with any provision or condition hereof, or consent pursuant to this Agreement shall be effective unless evidenced by an instrument in writing signed by the parties. The captions are for convenience only and shall not control or affect the meaning or construction of the provisions of this Agreement.

16. NOTICES: Any notice, demand or request required or permitted to be given under the provisions of this Agreement shall be in writing and shall be deeded to have been duly delivered on the date of personal delivery, or on the date of the mailing, if mailed by registered or certified mail, post prepaid and return receipt requested to the following addresses, or to such other address as any party may request in writing duly sent to all other parties to this Agreement.

TO SELLER:

PREMIERE HARDWOODS, LLC

5609 W. Latham, #105
Address

Phoenix, Arizona 85043
Address


TO BUYER:

SUPREME HARDWOODS OF ARIZONA, LLC

5155 E. Washington Street
Address

Phoenix, Arizona 85034
Address

17.     PRONOUNS: Whenever the pronoun "he" or "his" is used herein, it is understood that the usage is the common gender and refers to masculine, feminine and neuter genders and also singular and plural.

18.     SEVERABILITY: If any one or more of the provisions of this Agreement shall be held or found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

19.     BINDING UPON HEIRS: This Agreement shall be binding upon the parties, their heirs, legal representatives, successors and assigns.

20.     EXHIBITS: All exhibits and schedules mentioned herein are incorporated herein by reference.

21.     GOVERNING LAW: This Agreement and all amendments hereto are to be governed by the laws of the State of Arizona.

22.     COUNTERPARTS: This Agreement may be executed in two or more counterparts, all of which taken together, shall constitute one and the same Agreement.

In Witness Whereof, the undersigned have signed this Agreement as of the day of the year first written above.

SELLER:
**PREMIERE HARDWOODS, LLC**


By:


BUYER:
**SUPREME HARDWOODS OF ARIZONA, LLC**


By:

**EXHIBIT "1"**

mF

SECRETARY OF STATE

2011 FEB 28 PH 12: 05

FILED

201116431021

02/28/2011  1:14PM 000002 #8836
TRXY MARTHA
THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

```
ARIZONA BUSINESS BANK
ATTN: LOAN OPERATIONS
P.O. BOX 8779
DENVER, CO 80201
```

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Premiere Hardwoods, L.L.C. | | | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 616 S. 55th Ave. #101 | Phoenix | AZ | 85043 | | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION LLC | 1f. JURISDICTION OF ORGANIZATION AZ | 1g. ORGANIZATIONAL ID #, if any | ☒ NONE |
|---|---|---|---|---|---|

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | ☐ NONE |
|---|---|---|---|---|---|

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| ARIZONA BUSINESS BANK | | | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 6909 E. GREENWAY PKWY, STE. 150 | SCOTTSDALE | AZ | 85254 | | USA |

4. This FINANCING STATEMENT covers the following collateral

All Inventory, Chattel Paper, Accounts, Equipment, General Intangibles and Fixtures located at: 616 S. 55th Ave. #101, Phoenix AZ 85043; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds).

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☒ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
| 8. OPTIONAL FILER REFERENCE DATA | | | | | | |

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

Harland Financial Solutions
400 S.W. 8th Avenue, Portland, Oregon 97204

Arizona Uncertified Copy Secretary of State

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT**

| | 9a. ORGANIZATION'S NAME | | |
|---|---|---|---|
| OR | Premiere Hardwoods, L.L.C. | | |
| | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |

**10. MISCELLANEOUS:**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one name (11a or 11b) - do not abbreviate or combine names

| | 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 11d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any | ☐ NONE |
|---|---|---|---|---|---|

**12. ☐ ADDITIONAL SECURED PARTY'S or ☐ ASSIGNOR S/P'S NAME** - insert only one name (12a or 12b)

| | 12a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**13. This FINANCING STATEMENT covers** ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☒ fixture filing.

**14. Description of real estate.**

**16. Additional collateral description.**

**15. Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):**

**17. Check only if applicable and check only one box.**
Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

**18. Check only if applicable and check only one box.**
☐ Debtor is a TRANSMITTING UTILITY
☐ Filed in connection with a Manufactured-Home Transaction
☐ Filed in connection with a Public-Finance Transaction

Harland Financial Solutions
400 S.W. 6th Avenue, Portland, Oregon 97204

Arizona Uncertified Copy of Secretary of State

**EXHIBIT "2"**

In re     Premiere Hardwoods, LLC                                  Case No. _____

                                         Debtor

# SCHEDULE B - PERSONAL PROPERTY

Except as directed below, list all personal property of the debtor of whatever kind. If the debtor has no property in one or more of the categories, place an "x" in the appropriate position in the column labeled "None." If additional space is needed in any category, attach a separate sheet properly identified with the case name, case number, and the number of the category. If the debtor is married, state whether husband, wife, both, or the marital community own the property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor is an individual or a joint petition is filed, state the amount of any exemptions claimed only in Schedule C - Property Claimed as Exempt.

    **Do not list interests in executory contracts and unexpired leases on this schedule. List them in Schedule G - Executory Contracts and Unexpired Leases.**

If the property is being held for the debtor by someone else, state that person's name and address under "Description and Location of Property." If the property is being held for a minor child, simply state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m).

| Type of Property | N O N E | Description and Location of Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 1. Cash on hand | X | | | |
| 2. Checking, savings or other financial accounts, certificates of deposit, or shares in banks, savings and loan, thrift, building and loan, and homestead associations, or credit unions, brokerage houses, or cooperatives. | | Business Checking Account ending in 7621<br><br>Business Checking Account ending in 3700 | -<br><br>- | 500.00<br><br>200.00 |
| 3. Security deposits with public utilities, telephone companies, landlords, and others. | | Eastgroup Properties - security deposit Lease | - | 10,000.00 |
| 4. Household goods and furnishings, including audio, video, and computer equipment. | X | | | |
| 5. Books, pictures and other art objects, antiques, stamp, coin, record, tape, compact disc, and other collections or collectibles. | X | | | |
| 6. Wearing apparel. | X | | | |
| 7. Furs and jewelry. | X | | | |
| 8. Firearms and sports, photographic, and other hobby equipment. | X | | | |
| 9. Interests in insurance policies. Name insurance company of each policy and itemize surrender or refund value of each. | X | | | |
| 10. Annuities. Itemize and name each issuer. | X | | | |

                                                          Sub-Total >      10,700.00
                                                      (Total of this page)

    __5__   continuation sheets attached to the Schedule of Personal Property

Software Copyright (c) 1996-2014 - Best Case, LLC - www.bestcase.com    Main Document     Page 9 of 47             Best Case Bankruptcy

In re    Premiere Hardwoods, LLC                                                                    Case No. _____

                                                            Debtor

# SCHEDULE B - PERSONAL PROPERTY
(Continuation Sheet)

| Type of Property | N O N E | Description and Location of Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 11. Interests in an education IRA as defined in 26 U.S.C. § 530(b)(1) or under a qualified State tuition plan as defined in 26 U.S.C. § 529(b)(1). Give particulars. (File separately the record(s) of any such interest(s). 11 U.S.C. § 521(c).) | X | | | |
| 12. Interests in IRA, ERISA, Keogh, or other pension or profit sharing plans. Give particulars. | X | | | |
| 13. Stock and interests in incorporated and unincorporated businesses. Itemize. | X | | | |
| 14. Interests in partnerships or joint ventures. Itemize. | X | | | |
| 15. Government and corporate bonds and other negotiable and nonnegotiable instruments. | X | | | |
| 16. Accounts receivable. | | Accounts receivable | - | 187,000.00 |
| 17. Alimony, maintenance, support, and property settlements to which the debtor is or may be entitled. Give particulars. | X | | | |
| 18. Other liquidated debts owed to debtor including tax refunds. Give particulars. | X | | | |
| 19. Equitable or future interests, life estates, and rights or powers exercisable for the benefit of the debtor other than those listed in Schedule A - Real Property. | X | | | |
| 20. Contingent and noncontingent interests in estate of a decedent, death benefit plan, life insurance policy, or trust. | X | | | |
| 21. Other contingent and unliquidated claims of every nature, including claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims. Give estimated value of each. | X | | | |

                                                                                    Sub-Total >          187,000.00
                                                                                    (Total of this page)

Sheet   1   of   5   continuation sheets attached
to the Schedule of Personal Property

In re    Premiere Hardwoods, LLC                                        Case No. _____

                                         _____,
                                                    Debtor

## SCHEDULE B - PERSONAL PROPERTY
### (Continuation Sheet)

| Type of Property | N O N E | Description and Location of Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 22. Patents, copyrights, and other intellectual property. Give particulars. | X | | | |
| 23. Licenses, franchises, and other general intangibles. Give particulars. | X | | | |
| 24. Customer lists or other compilations containing personally identifiable information (as defined in 11 U.S.C. § 101(41A)) provided to the debtor by individuals in connection with obtaining a product or service from the debtor primarily for personal, family, or household purposes. | X | | | |
| 25. Automobiles, trucks, trailers, and other vehicles and accessories. | | 2011 Hyundai Sonata 180,000 miles | - | 9,000.00 |
| | | 2004 Ford F150 pickup 120,000 miles | - | 5,000.00 |
| | | Trailer | - | 4,500.00 |
| | | Curtain Van | - | 15,000.00 |
| 26. Boats, motors, and accessories. | X | | | |
| 27. Aircraft and accessories. | X | | | |
| 28. Office equipment, furnishings, and supplies. | | Desk and Credenzas | - | 7,500.00 |
| | | file cabinets | - | 2,500.00 |
| | | 4 sled chairs | - | 500.00 |
| | | Computers and printers | - | 300.00 |
| | | telephones | - | 100.00 |
| | | Office Equipment | - | 750.00 |
| | | HP Deskjet 400 | - | 100.00 |
| | | HP Deskjet 712C | - | 100.00 |
| | | Okidata Microline 320 | - | 200.00 |
| 29. Machinery, fixtures, equipment, and supplies used in business. | | 3 Phase A/C Compressor | - | 2,498.00 |

Sub-Total >
(Total of this page)                          48,048.00

Sheet _2_ of _5_ continuation sheets attached
to the Schedule of Personal Property

In re    Premiere Hardwoods, LLC                                    Case No. _____

                                    Debtor

## SCHEDULE B - PERSONAL PROPERTY
(Continuation Sheet)

| Type of Property | N O N E | Description and Location of Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| | | Laminator & Equipment | - | 40,000.00 |
| | | Compressor & Lift Tables | - | 7,700.00 |
| | | Racks, Work Stat, Carts | - | 37,500.00 |
| | | 4 forklifts | - | 20,000.00 |
| | | Miscellaneous Supplies | - | 5,000.00 |
| | | 2 Shop Carts | - | 896.00 |
| | | Warehouse racks | - | 2,986.00 |
| | | Warehouse Racks | - | 4,720.00 |
| | | Laminate Racks | - | 1,760.00 |
| | | Rack | - | 343.00 |
| | | Edgebander | - | 6,000.00 |
| | | Grinder | - | 3,000.00 |
| | | Southworth Lift Table | - | 1,000.00 |
| | | OR-T 50 Battery Combo | - | 1,550.00 |
| | | Yale 5000 lb Forklift | - | 5,000.00 |
| | | Hyster 5000 lb Forklift | - | 5,000.00 |
| | | 1995 Schelling Panel Saw | - | 20,000.00 |
| | | 1999 Andi Stratob Router | - | 15,000.00 |
| | | 1994 Watkins 5 Hd Moulder | - | 20,000.00 |
| | | 1997 Lobo Knife Grinder | - | 400.00 |
| | | CTD dbl Miter Saw | - | 1,500.00 |
| | | 2004 Screw Air Compressor | - | 2,000.00 |
| | | Kaeser Air Dryer | - | 500.00 |
| | | Cyclone Dust Collector 25 | - | 3,000.00 |

Sub-Total >
(Total of this page)                                              204,855.00

Sheet _3_ of _5_ continuation sheets attached
to the Schedule of Personal Property

In re    Premiere Hardwoods, LLC                                    Case No. _____

_____
                        Debtor

## SCHEDULE B - PERSONAL PROPERTY
(Continuation Sheet)

| Type of Property | N O N E | Description and Location of Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| | | Jet Dust Collector | - | 200.00 |
| | | Delta 10" Unisaw | - | 300.00 |
| | | Ridgid 10" Chop Saw | - | 50.00 |
| | | Ryobi 10" Chop Saw | - | 50.00 |
| | | Ryobi 16" Scroll Saw | - | 50.00 |
| | | Delta 8 1/4 Miter Saw | - | 50.00 |
| | | Delta Bench Grinder #840 | - | 50.00 |
| | | Delta Bench Grinder #6 | - | 50.00 |
| | | Carlson Roller Index Tbl | - | 100.00 |
| | | Jesco Tilt Dumpster | - | 200.00 |
| | | Steel Bander Cart (2) | - | 100.00 |
| | | 3 Lift Tables | - | 600.00 |
| | | 2 pallet Racks | - | 200.00 |
| | | 3 Cantilever Racks | - | 600.00 |
| | | SK 224 Surface Planer | - | 20,000.00 |
| | | Belair Dryer #ACT1000-1 | - | 2,000.00 |
| | | Dipchain Gang Ripsaw | - | 20,000.00 |
| | | Dust Collector | - | 3,115.00 |
| | | Spindle Assembly 40MM | - | 3,226.00 |
| | | Pinch Roller | - | 1,725.00 |
| | | Aggregate Head - Anderson | - | 5,610.00 |
| | | Dust Collecto 10hp | - | 2,500.00 |
| 30. Inventory. | | Inventory | - | 205,000.00 |
| 31. Animals. | X | | | |

|  | Sub-Total > (Total of this page) | 265,776.00 |
|---|---|---|

Sheet __4__ of __5__ continuation sheets attached
to the Schedule of Personal Property

Software Copyright (c) 1996-2014 - Best Case, LLC - www.bestcase.com                                    Best Case Bankruptcy

In re    Premiere Hardwoods, LLC _____,    Case No._____

                              Debtor

## SCHEDULE B - PERSONAL PROPERTY
### (Continuation Sheet)

| Type of Property | N O N E | Description and Location of Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 32. Crops - growing or harvested. Give particulars. | X | | | |
| 33. Farming equipment and implements. | X | | | |
| 34. Farm supplies, chemicals, and feed. | X | | | |
| 35. Other personal property of any kind not already listed. Itemize. | X | | | |

|  | Sub-Total > (Total of this page) | 0.00 |
|---|---|---|
|  | Total > | 716,379.00 |

Sheet __5__ of __5__ continuation sheets attached
to the Schedule of Personal Property

(Report also on Summary of Schedules)

Software Copyright (c) 1996-2014 - Best Case, LLC - www.bestcase.com    Best Case Bankruptcy